In the
United States Court of Appeals
For the Seventh Circuit

Nos. 00-1688, 00-1699

MARK J. BRUSO,

Plaintiff-Appellee, Cross-Appellant,

v.

UNITED AIRLINES, INCORPORATED,

Defendant-Appellant, Cross-Appellee.


Appeals from the United States District Court
for the Northern District of Illinois, Eastern
Division.
No. 97 C 7005--Charles R. Norgle, Sr., Judge.


ARGUED NOVEMBER 2, 2000--DECIDED FEBRUARY 2, 2001


   Before HARLINGTON WOOD, JR., RIPPLE and
ROVNER, Circuit Judges.

   RIPPLE, Circuit Judge.  Mark Bruso sued
his employer, United Airlines, Inc.
("United"), alleging that United demoted
him in retaliation for his reports of
sexual harassment by a fellow supervisor
in violation of Title VII of the Civil
Rights Act of 1964, 42 U.S.C. sec. 2000e
et seq. A jury found in favor of Mr.
Bruso and awarded him $10,000 in damages.
Mr. Bruso sought to retry the issue of
damages because he believed the jury's
award was insufficient, but the district
court refused his request. The district
court also granted United's motion for
judgment as a matter of law on the issue
of punitive damages. Following the
court's entry of judgment on the jury's
verdict, Mr. Bruso moved for various
forms of equitable relief and for an
award of attorneys' fees. The district
court denied his requests for equitable
relief but granted him the $393,418.75 he
requested in attorneys' fees. United now
appeals the court's award of attorneys'
fees. Mr. Bruso cross-appeals the court's
refusal to retry the issue of damages,
the court's grant of judgment as a matter
of law against him on the issue of

punitive damages, and the court's denial of his requests for equitable relief. For the reasons set forth in the following opinion, we affirm in part, reverse in part, and remand for further proceedings.

I
BACKGROUND
A.  Facts

Mark Bruso has been an employee of United since 1987. From February 5, 1996, to January 24, 1997, Mr. Bruso served as an administrative supervisor of cabin services at O'Hare International Airport in Chicago ("O'Hare"). His direct supervisor was John King, United's manager of cabin services at O'Hare. King, in turn, reported to Rod Strickland, United's station manager at O'Hare. This team of managers and supervisors had received extensive training from United's senior litigation counsel, Nancy Gordon, on United's policy of zero tolerance for discrimination and sexual harassment.

The events of this case originate with the conduct of Kevin Sporer, another administrative supervisor under King's charge. Sporer was not well liked among other United employees; he had a short temper and was known to be verbally abusive to his subordinates. Sporer was known to scream and swear at female employees, sometimes threatening to fire them. Various United employees reported Sporer's behavior to King, and, although King occasionally spoke to Sporer about his conduct, he never formally disciplined him.

On December 18, 1996, Mr. Bruso was in one of United's ready rooms with Amy Swanson and Juan Palacios, two nonsupervisory United employees. Sporer charged into the room and yelled at Swanson to retrieve some computer printouts, then to leave for the day. Mr. Bruso confronted Sporer and told him that his aggressive behavior toward Swanson was out of line. According to Swanson and Palacios, Sporer then began a confrontation by yelling at Mr. Bruso, and Mr. Bruso initially responded in a normal tone of voice but began yelling as Sporer's tirade continued. Eventually, Sporer said to Mr. Bruso, "If you don't get out of my face, I'm going to punch you." R.111-4 at 667. Mr. Bruso's

response to Sporer was "Go ahead." Id. Palacios eventually left the room because he thought there was going to be a physical fight between Sporer and Mr. Bruso. No such fight occurred, however, because Sporer eventually stormed out of the room.

That evening, Mr. Bruso telephoned King and informed him of the confrontation with Sporer. King asked Swanson and Palacios to submit written statements describing what they had witnessed, which each of them did. The following day, King had a meeting with Mr. Bruso and Sporer at which he told them that he had initially intended to fire them both. Instead, King asked Mr. Bruso and Sporer to provide written statements. He discussed their versions of the altercation with them and then took the matter under advisement. The next day, King informed Mr. Bruso that he was going to remove Sporer from his supervisory duties and that he was going to place a letter of counsel in Mr. Bruso's personnel file.

Mr. Bruso, having never before received a formal reprimand while working for United, wrote a letter to King to elaborate further on his confrontation with Sporer. Mr. Bruso explained in his letter that several of United's female employees had complained about Sporer's conduct toward them, and, in Mr. Bruso's opinion, Sporer's problem working with women created potential legal difficulties for United. He detailed his own experiences with Sporer, as well as accounts that he had received from Swanson and another United employee, Bea Wiggens, concerning Sporer's conduct toward them. Mr. Bruso gave copies of his letter to King and to Strickland.

After reviewing Mr. Bruso's letter, United's management commissioned an independent review team ("IRT") to review the allegations of harassment concerning Sporer that Mr. Bruso had detailed in his letter to King. The IRT was comprised of Richard Bolanowski and Richard Mayer, both of whom were United employees and had received training in the antidiscrimination laws and United's policies designed to implement those laws. Mr. Bruso was suspended with pay while the IRT conducted its investigation./1

The IRT compiled a list of witnesses it intended to interview from Mr. Bruso's letter to King and from the initial interviews it conducted. The first witness the IRT interviewed was King. King told the IRT that several employees had lodged complaints with him about Sporer's conduct, including a male employee who told King that Sporer did not treat women well. The IRT also interviewed Swanson and Wiggens, both of whom confirmed essentially what Mr. Bruso had written in his letter to King. Wiggens verified that Sporer often berated her and belittled her and moved her to another shift so that he would not have to work with her. Swanson confirmed that Sporer stared at her and frequently asked her inappropriate questions about her personal life. The IRT spoke with two other female employees, both of whom stated that Sporer had made them uncomfortable; however, the IRT did not interview the remaining witnesses on the list it originally created./2

In addition to speaking with these witnesses, the IRT also spoke with Mr. Bruso. The IRT met with Mr. Bruso and explained to him that his letter to King put United in a precarious legal position because it accused Sporer of sexually harassing United's female employees. Mr. Bruso objected to this characterization of his letter, and he provided another written statement in which he said that his original letter did not actually accuse Sporer of sexual harassment; instead, he had only intended to report to United's management what other employees had told him in order to alert United to the potential problems presented by Sporer's conduct.

Based on the information it gathered during its investigation, the IRT concluded that Sporer, in fact, had not sexually harassed or discriminated against anyone. The IRT filed a written report suggesting that Mr. Bruso had written his accusatory letter to King to try to justify his role in the December 18 confrontation with Sporer. King accepted the IRT's conclusion, and he wrote a letter to Mr. Bruso explaining that, in his opinion, Mr. Bruso either had falsely accused Sporer of sexual harassment or had failed to report Sporer's inappropriate conduct in a timely manner. King also mentioned in his

letter that Mr. Bruso's behavior during the December 18 confrontation with Sporer, "while inappropriate for any employee, was inexcusable for a member of management." R.73, Ex.D at 2. As a result, King demoted Mr. Bruso to the last nonsupervisory position he held at United: a ramp serviceman, or baggage handler. King's decision to demote Mr. Bruso was affirmed by Strickland.

Mr. Bruso chose to protest his demotion, and he took time off work, without pay, to prepare his case. He filed a formal appeal, and Strickland was the manager designated to hear the appeal. Because Strickland had affirmed his demotion, Mr. Bruso requested that his appeal be reassigned, but his request was refused. Mr. Bruso also sought permission to present witnesses on his behalf at his management review hearing, but Strickland refused that request as well. Elizabeth Cavanaugh, a United employee who took notes at Mr. Bruso's management review hearing, testified at trial that Strickland was adversarial and angry during the meeting. Ultimately, Strickland denied Mr. Bruso's appeal.

Following that denial, Mr. Bruso protested his demotion to the president and vice president of United. Gordon was asked to respond to Mr. Bruso's complaints. Gordon asked Mr. Bruso to submit written materials supporting his position, which he did. Based on her review of Mr. Bruso's case, Gordon concluded that Mr. Bruso's accounts of Sporer's conduct were inconsistent and that Mr. Bruso had changed his story as to whether Sporer had engaged in sexual harassment. In Gordon's opinion, Mr. Bruso had selectively and misleadingly chosen language from the sexual harassment training materials she had distributed in order to support his claims of harassment. Gordon therefore declined to rescind Mr. Bruso's demotion.

Mr. Bruso began work in his demoted position as a ramp serviceman on January 24, 1997. Because of his job change, he had to purchase new uniforms and to pay new union dues. Mr. Bruso's demotion took an emotional toll on him because he felt he was mocked by his coworkers in his new position, and he sought the assistance of a psychologist in coping with his distress. In the fall of 1998, Mr. Bruso

had to undergo gallbladder surgery./3 Because his new position as a ramp serviceman required him to perform heavy lifting and carrying, Mr. Bruso was not able to return to work following his surgery as quickly as he would have if he had still been a supervisor, a position which required no manual labor.

## B. Proceedings in the District Court

Mr. Bruso filed a one-count complaint against United in district court. He alleged that United violated Title VII by demoting him in retaliation for his report of Sporer's sexual harassment. United defended against Mr. Bruso's allegations by arguing that it demoted Mr. Bruso because he either had falsely accused Sporer of sexual harassment in order to justify and avoid reprimand for his role in the December 18 confrontation, or, alternatively, if Mr. Bruso did believe that Sporer had actually harassed United's female employees, he unnecessarily put United at risk by failing to report Sporer's conduct in a timely manner. Mr. Bruso argued to the jury that the reasons United proffered for his demotion were pretextual. He claimed that the IRT investigation was a sham, and that United tried to discredit him in order to cover up its management's knowledge of Sporer's harassment and protect itself from legal liability. He asked the jury to award him over $46,000 in lost wages and direct expenses as a result of United's retaliatory demotion,/4 in addition to $1 million in compensatory damages for emotional distress and damage to his reputation. Mr. Bruso also sought to submit the issue of punitive damages to the jury. The court, however, ruled that United had not been recklessly indifferent to Mr. Bruso's complaints of harassment, which made an award of punitive damages unwarranted. Therefore, the court granted judgment as a matter of law in favor of United on the issue of punitive damages.

The jury returned a verdict in Mr. Bruso's favor, awarding him $10,000 in lost wages and direct expenses and no compensatory damages. After the jury returned its verdict, Mr. Bruso moved for a new trial on damages, arguing that the jury's award of only $10,000 was against the manifest weight of the evidence. The

district court denied this motion because it found that there was a rational basis for the jury's award of $10,000 in lost wages and direct expenses and that the jury was free to disregard Mr. Bruso's evidence of emotional distress and damage to his reputation.

Mr. Bruso asked the district court for three forms of equitable relief. First, Mr. Bruso requested that he be reinstated to his former position as a supervisor. The court declined to reinstate Mr. Bruso because it concluded that his relationship with United's management was too fraught with hostility to permit a productive working relationship and because Mr. Bruso had not behaved as a supervisor should have behaved during his initial confrontation with Sporer. Second, Mr. Bruso asked the court to expunge his personnel record of any discipline related to his reports of Sporer's harassment or any reference to his removal from management. Stating that it would not meddle in United's personnel affairs, the district court refused to expunge Mr. Bruso's personnel record. Third, Mr. Bruso asked the court to enjoin United from further retaliating against him or any other United employee. The district court denied Mr. Bruso's request for an injunction because it found no evidence that United engaged in systematic retaliation or discouraged its employees from reporting harassment.

Lastly, Mr. Bruso submitted a request for attorneys' fees to the district court. The lodestar figure Mr. Bruso sub mitted was $393,418.75. United objected to this amount, claiming that it was excessive in light of the $10,000 award Mr. Bruso received. The district court disagreed, and it awarded Mr. Bruso the lodestar figure he requested.

II
DISCUSSION

United has appealed the district court's award of attorneys' fees to Mr. Bruso. Mr. Bruso, in turn, asks us to review several aspects of the district court's disposition, including its refusal to retry the issue of damages, its refusal to submit the issue of punitive damages to the jury, and its refusal to provide any equitable relief. Because the propriety of the amount of the attorneys'

fee award depends on the degree of Mr. Bruso's success in this litigation, we turn first to Mr. Bruso's requests.

## A.  Damages Award

Mr. Bruso's first challenge is to the amount of the jury's damages award. Mr. Bruso moved in the district court for a new trial on the issue of damages because he believed that the jury's award was against the manifest weight of the evidence. Mr. Bruso maintained that the uncontested evidence he submitted regarding his decrease in salary, lost pay because of time he took off from work to fight his demotion and to recover from his gallbladder surgery, union dues, equipment costs, lost overtime, and psychologist's bills established that he was entitled to over $46,000 in lost wages and direct expenses. The district court disagreed and denied his motion. The district court explained that Mr. Bruso voluntarily took time off to fight his demotion, and the jury was free to conclude that Mr. Bruso was not entitled to the wages he lost during his voluntary leave of absence. The court further concluded that the jury reasonably could have decided that Mr. Bruso was not entitled to the wages he lost while he was recovering from his gallbladder surgery. Lastly, the court stated that, because the jury was free to conclude that United did not cause Mr. Bruso's mental anguish or emotional suffering, he was not entitled to compensatory damages. We review the district court's denial of a motion for a new trial on damages for an abuse of discretion. See Gavoni v. Dobbs House, Inc., 164 F.3d 1071, 1075 (7th Cir. 1999). "[T]he plaintiffs must show that 'there is no rational connection between [the award] and the evidence.'" Id. (quoting Raybestos Prod. Co. v. Younger, 54 F.3d 1234, 1244 (7th Cir. 1995)). Because we conclude that there is a rational basis for the jury's damage award, we affirm the district court's denial of Mr. Bruso's motion for a new trial.

The evidence Mr. Bruso submitted to the jury established that Mr. Bruso lost $8,533.84 in wages as a result of his demotion from a supervisory position to his current position as a ramp serviceman. Mr. Bruso's evidence also established that, in order to begin

working as a ramp serviceman, he had to pay $961 in union dues and $400 for work shoes and uniforms. When these three amounts are added together, the total loss is $9,894.84. This amount is sufficiently close to the jury's $10,000 award that we are unable to conclude that there was no rational basis for it.

Mr. Bruso argues that it was not within the jury's province to ignore his additional evidence of loss. However, Mr. Bruso is only entitled to compensation for the damages he proved by a preponderance of the evidence. See Taliferro v. Augle, 757 F.2d 157, 162 (7th Cir. 1985) ("A plaintiff is not permitted to throw himself on the generosity of the jury. If he wants damages, he must prove them."); see also Avitia v. Metropolitan Club of Chicago, Inc., 49 F.3d 1219, 1229 (7th Cir. 1995) ("[I]t is not implausible that [a retaliation plaintiff] should have been deeply upset at losing a job he had held for so many years; but the deep upset had to be proved, and was not."). We believe that the evidence in the record is sufficient to justify the jury's apparent conclusion that Mr. Bruso did not prove that he was entitled to the remaining damages he requested.

Mr. Bruso first maintains that the jury erred in failing to award him over $18,900 in lost wages as a result of the time he took off from work in order to appeal his demotion. However, Mr. Bruso requested and voluntarily took this time off; he asked United for voluntary leave, and United granted his request. There was no indication that United forced him to take this leave or that it was necessary for him to do so in order to appeal his demotion. Thus, the jury reasonably could have determined that Mr. Bruso brought this monetary loss upon himself, that United did not cause the loss, and that United should not be forced to pay for Mr. Bruso's voluntary decision to take this time off work.

Mr. Bruso also insists that he should be compensated for $2,643.50 he lost in overtime once he was demoted. Mr. Bruso testified, however, that he did not take overtime as a ramp serviceman because the job involved heavy physical labor. He also testified that he did not think overtime was available on his shift as a

ramp serviceman, but he admitted that he was not sure and that he could have been mistaken. From Mr. Bruso's own testimony, the jury could have concluded that Mr. Bruso failed to prove that overtime was not available to him as a ramp serviceman, whereas it was as a supervisor. Mr. Bruso's inconclusive testimony also left room for the jury to conclude that he had the opportunity to earn overtime as a ramp serviceman but chose not to pursue that opportunity. As a result, the jury was free to conclude that United should not have to compensate Mr. Bruso for this lost opportunity.

With respect to the wages Mr. Bruso was unable to earn as a result of his delayed return to work following his gallbladder surgery, Mr. Bruso himself admits that the onset of his gallbladder condition was not related to his demotion. The surgery took place over one year after Mr. Bruso's demotion, making any connection between the surgery and the demotion quite remote. Furthermore, Mr. Bruso testified that he had a large abdominal incision that caused him severe pain. Although he also testified that the physical labor he had to perform as a ramp serviceman aggravated the pain, his claim that he could have returned to work sooner had he still been a supervisor is fairly speculative./5 Therefore, it was not unreasonable for the jury to conclude that the physical pain Mr. Bruso described would have kept him away from his supervisory duties, as well.

Lastly, the jury was free to disbelieve Mr. Bruso's claims of emotional suffering and mental anguish. Although Mr. Bruso argues that the fact that he sought the assistance of a psychologist automatically entitles him to compensation for the psychologist's bills, his argument is without merit. It is within the jury's province to evaluate the credibility of witnesses who testify to emotional distress, and we shall not disturb those credibility determinations on appeal. If the jury disbelieved Mr. Bruso's testimony regarding the humiliation, anger, and depression he felt following his demotion, as it was free to do, it was not obligated to award him compensation for his psychologist's bills.

Because the jury's award of $10,000 in

lost wages and no compensatory damages has a rational basis in the record, we shall not disturb its determination. The trial court did not abuse its discretion in denying Mr. Bruso's motion for a new trial on damages.

## B.   Punitive Damages

The district court granted United's motion for judgment as a matter of law on the issue of punitive damages. We review de novo a district court's grant of judgment as a matter of law. See Hamner v. St. Vincent Hosp. & Health Care Ctr., Inc., 224 F.3d 701, 704 (7th Cir. 2000). "[W]e 'review the evidence in a light most favorable to the non-moving party to determine whether there was no legally sufficient evidentiary basis for a reasonable jury to find for the non-moving party.'" Id. (quoting Payne v. Milwaukee County, 146 F.3d 430, 432 (7th Cir. 1998)).

Title VII authorizes an award of punitive damages when a plaintiff demonstrates that the defendant engaged in intentional discrimination "with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. sec. 1981a(b)(1). In Kolstad v. American Dental Association, 527 U.S. 526 (1999), the Supreme Court provided a three-part framework for determining whether an award of punitive damages is proper under the statutory standard. To be entitled to punitive damages, a plaintiff must first demonstrate that the employer acted with the requisite mental state. The employer must have acted with knowledge that its actions may have violated federal law. See id. at 535. The employer need not be aware that it is engaging in discrimination. See id. Instead, it need only act "in the face of a perceived risk that its actions will violate federal law." Id. at 536; see also Gentry v. Export Packaging Co., No. 00-2367, 2001 WL 59432 at *7 (7th Cir. Jan. 25, 2001). A plaintiff may satisfy this element by demonstrating that the relevant individuals knew of or were familiar with the antidiscrimination laws and the employer's policies for implementing those laws./6 A plaintiff may also establish that the defendant acted with reckless disregard for his federally protected rights by showing that the

defendant's employees lied, either to the plaintiff or to the jury, in order to cover up their discriminatory actions. See Passantino v. Johnson & Johnson Consumer Prods., Inc., 212 F.3d 493, 516 (9th Cir. 2000) (stating that the jury could have concluded that the defendants did not reasonably believe their conduct was lawful because they lied to the plaintiff and at trial in order to conceal their discriminatory actions against her).

Once a plaintiff has established that the defendant, or its employees, acted in reckless disregard of his federally protected rights, he must establish a basis for imputing liability to the employer. See Kolstad, 527 U.S. at 539. The plaintiff must demonstrate that the employees who discriminated against him are managerial agents acting within the scope of their employment. See id. at 543. Although the Supreme Court did not provide specific standards for conducting this inquiry, it did indicate that the inquiry should be controlled by general principles of federal agency law. See id. at 542. The Court further indicated that determining whether an employee acts in a managerial capacity is necessarily a fact-intensive inquiry, and the fact finder ought to consider the kind of authority the employer has given the employee, the amount of discretion given to the employee in executing his job duties, and the manner in which those duties are carried out. See id. at 543.

Even if the plaintiff establishes that the employer's managerial agents recklessly disregarded his federally pro tected rights while acting within the scope of their employment, the employer may avoid liability for punitive damages if it can show that it engaged in good faith efforts to implement an antidiscrimination policy. See id. at 545. An employer's good faith efforts to comply with the requirements of Title VII demonstrate that the employer itself did not act in reckless disregard of federally protected rights, thus making it inappropriate to punish the employer for its employees' contravention of its established policies. See id. at 544-45. Every court to have addressed this issue thus far has concluded that, although the implementation of a written or formal antidiscrimination policy is relevant to

evaluating an employer's good faith efforts at Title VII compliance, it is not sufficient in and of itself to insulate an employer from a punitive damages award./7 Otherwise, employers would have an incentive to adopt formal policies in order to escape liability for punitive damages, but they would have no incentive to enforce those policies. See Passantino, 212 F.3d at 517 ("Although the purpose of Title VII is served by rewarding employers who adopt anti-discrimination policies, it would be undermined if those policies were not implemented, and were allowed instead to serve only as a device to allow employers to escape punitive damages for the discriminatory activities of their managerial employees.") (internal citations omitted).

The district court granted United's motion for judgment as a matter of law with respect to punitive damages because it concluded that United had not been indifferent to Mr. Bruso's complaints regarding his demotion. The court stressed that Mr. Bruso was able to protest his demotion to multiple levels of United's management and that he always received a response. According to thedistrict court, "No one [at United] tried to stop him [Mr. Bruso] in his tracks. No one bounced him off or ignored him." R.111-9 at 1642. Given United's attentiveness to Mr. Bruso's complaints, the court determined that no reasonable jury could have found that United was recklessly indifferent to Mr. Bruso's federally protected rights or that there was a "knowing and willful violation of the statute here." Id. at 1643. Although the district court acknowledged Kolstad as establishing the controlling legal principles, it did not apply the Kolstad framework we have just discussed. We must conclude that the district court erred in failing to apply Kolstad.

Applying the Kolstad framework, we are convinced that Mr. Bruso presented sufficient evidence at trial to enable a reasonable jury to determine that United was recklessly indifferent to Mr. Bruso's federally protected rights within the meaning of sec. 1981a. Mr. Bruso demonstrated at trial that the major players in the decision to demote him were familiar with the antidiscrimination principles of Title VII and United's

zero-tolerance-for-discrimination policy, which was designed to implement Title VII in United's workplace. King himself admitted as much when he stated in his letter to Mr. Bruso that he (King) had discussed United's zero-tolerance policy with every supervisor "on more than one occasion." R.73, Ex.D at 2. Strickland also demonstrated his familiarity with Title VII when, after he decided to affirm King's decision to demote Mr. Bruso, he sent Mr. Bruso a letter explaining, "Whether or not you [Mr. Bruso] actually accused Kevin [Sporer] of sexual harassment, gender, or racial discrimination, the behavior you went on to describe clearly would fall into those categories and would be illegal." R.55, Ex.F at 4. Strickland also testified at trial that he had been to at least three training sessions on sexual harassment and discrimination and that he had read United's zero-tolerance policy and informational materials. Gordon, who was Mr. Bruso's final appeal in his attempt to challenge his demotion, was herselfresponsible for educating and training United's employees about Title VII and United's antidiscrimination policies. Based on this evidence, a reasonable jury could have concluded that King, Strickland, and Gordon were familiar with Title VII and must have been aware of the possibility that demoting Mr. Bruso after he had come forward with allegations of harassment would violate Title VII. See Kolstad, 527 U.S. at 535; Ogden v. Wax Works, Inc., 214 F.3d 999, 1010 (8th Cir. 2000).

There can also be little doubt that Mr. Bruso presented sufficient evidence to allow a reasonable jury to conclude that King, Strickland, and Gordon were United's managerial agents acting within the scope of their employment. King testified that he was United's manager of cabin service at O'Hare. As such, he was responsible for overseeing the cleaning and provisioning of over 440 departing planes per day. He had seven supervisors who reported directly to him, and those supervisors could have up to 125 employees reporting to them. King was responsible for assigning work to various employees, and the testimony at trial indicated that he had the authority to mediate disputes among employees and to investigate claims of harassment or discrimination. Based on this evidence, a

reasonable jury could have concluded that King was given enough discretion as part of his employment at United to make him a managerial agent acting in the scope of his employment when he recommended that Mr. Bruso be demoted.

With respect to Strickland, the testimony at trial established that he was United's general manager at O'Hare, which put him "in charge of the entire O'Hare Airport for United Airlines, the entire United Airlines portion." R.111-7 at 1208. Strickland also testified that managers such as King needed his approval before they could demote one of their subordinates. This evidence certainly would have allowed a reasonable jury to conclude that Strickland was a managerial agent of United acting within the scope of his employment in affirming Mr. Bruso's demotion.

The record also provides sufficient evidence to allow a reasonable jury to conclude that Gordon was United's managerial agent. Gordon was United's senior litigation counsel. She advised United's employees on labor and employment matters, conducted training courses on harassment and discrimination, and prepared and distributed literature to employees to help prevent harassment and discrimination in the workplace. In fact, Gordon testified that she was responsible for writing most of the reference material United gave to its supervisors as guidance in dealing with harassment or discrimination. Gordon also explained that her superior, United's deputy general counsel, asked her "to review the events surrounding Mr. Bruso's demotion and essentially make a decision as to whether or not the demotion had been correct . . . and appropriate." R.111-7 at 1383. Based on this evidence, a reasonable jury could have concluded that Gordon was given enough discretion in handling personnel matters, and harassment issues in particular, to make her United's managerial agent acting within the scope of her employment when she refused to rescind Mr. Bruso's demotion./8

Lastly, Mr. Bruso presented sufficient evidence to allow a reasonable jury to conclude that United did not engage in a good faith effort to comply with Title VII. Although United did have a formal

zero-tolerance-for-discrimination policy in place and it did educate its employees about that policy, Mr. Bruso introduced evidence at trial that suggested that United's top management officials disregarded the policy by refusing to remedy Sporer's harassment even though they knew about it. From the evidence at trial, the jury could have concluded that the IRT investigation into Sporer's conduct was a sham designed to discredit Mr. Bruso and to protect the managers who should have taken action to correct Sporer's harassment sooner. If the jury accepted this evidence, which its verdict in Mr. Bruso's favor suggests it might have, then it could have concluded that United did not make a good faith effort to comply with Title VII despite its formal antidiscrimination policy. See Lowery v. Circuit City Stores, Inc., 206 F.3d 431, 446 (4th Cir. 2000).

Because Mr. Bruso presented sufficient evidence to allow a reasonable jury to conclude that United acted in reckless disregard of his federally protected rights within the meaning of sec. 1981a and Kolstad, the district court abused its discretion in granting United's motion for judgment as a matter of law as to punitive damages. Mr. Bruso should have been allowed to ask the jury for an award of punitive damages, and he is therefore entitled to a new trial on this issue.

C.  Equitable Relief

Mr. Bruso asked the district court for three forms of equitable relief: reinstatement, expungement of his personnel record, and a permanent injunction against further retaliation. The district court denied each of his requests. In addition, the district court determined that Mr. Bruso was not entitled to front pay. We review a court's decision with respect to equitable relief for an abuse of discretion. See EEOC v. Century Broad. Corp., 957 F.2d 1446, 1462 (7th Cir. 1992).

1.  Reinstatement

After the jury returned a verdict in his favor on his retaliatory demotion claim, Mr. Bruso asked the district court to

reinstate him to his former position as a supervisor. The district court declined to do so, finding that "the lingering tension between Bruso and United management makes reinstatement to his former supervisory position particularly infeasible." R.87 at 5. In support of its conclusion, the court explained that, during closing arguments, Mr. Bruso's attorney "accused King of attempting to 'deep six' his complaints about Sporer and similarly accused Strickland of using the review process to further a cover-up. Also, Bruso's counsel argued that United, including its president, engaged in a cover-up to protect the company 'at all costs.'" Id. (internal citations omitted). The district court further relied on the fact that Mr. Bruso's case took aim at much of United's managerial hierarchy, thereby poisoning any potential working relationship. Lastly, the district court stated that Mr. Bruso did not act as a supervisor should have acted during his initial confrontation with Sporer and during the ensuing investigation.

The equitable remedy of reinstatement requires the court to strike a delicate balance. On the one hand, reinstatement is the preferred remedy for victims of discrimination, and the court should award it when doing so is feasible. See McKnight v. General Motors Corp., 973 F.2d 1366, 1370 (7th Cir. 1992) (quoting Coston v. Plitt Theatres, Inc., 831 F.2d 1321, 1330 (7th Cir. 1987), vacated on other grounds, 486 U.S. 1020 (1998)). On the other hand, a court is not required to reinstate a successful plaintiff where the result would be a working relationship fraught with hostility and friction. See Hutchison v. Amateur Elec. Supply, Inc., 42 F.3d 1037, 1045-46 (7th Cir. 1994). Reinstatement in such situations could potentially cause the court to become embroiled in each and every employment dispute that arose between the plaintiff and the employer following the plaintiff's reinstatement. See id. at 1046. A court must be careful, however, not to allow an employer to use its anger or hostility toward the plaintiff for having filed a lawsuit as an excuse to avoid the plaintiff's reinstatement. See Century Broad. Corp., 957 F.2d at 1462.

The court's task of identifying the source of the friction between the

employer and the plaintiff following the litigation may be straightforward when there is absolutely no evidence that there was friction in the relationship before the plaintiff filed suit. See id. However, reinstatement may become particularly infeasible if the plaintiff would no longer enjoy the confidence and respect of his superiors once reinstated. See Tennes v. Massachusetts Dep't of Revenue, 944 F.2d 372, 381 (7th Cir. 1991). Reinstatement may also be more problematic when the plaintiff holds a management position, see Avitia, 49 F.3d at 1230, or would be supervised by the same individuals who discriminated against him in the first place, see Price v. Marshall Erdman & Assocs., Inc., 966 F.2d 320, 325 (7th Cir. 1992).

In this case, Mr. Bruso is asking to be returned to a management position in which he could be supervised by some of the same individuals who were involved in his retaliatory demotion. The district court was therefore correct to consider the relationship between Mr. Bruso and these individuals following the litigation and whether any hostility still lingering between them would poison the prospect of a future working relationship. We are concerned, however, by the district court's emphasis on the litigation itself as the basis for denying reinstatement. In alleging--and proving to the satisfaction of the jury--that United's management had retaliated against him for bringing to its attention the fact that another company supervisor had engaged in proscribed conduct, Mr. Bruso necessarily made accusations against company management personnel that hardly reflected well on their personal integrity or their management skills. We do not believe, however, that the angry reaction of United's management to Mr. Bruso's success before the jury can, standing alone, justify denying reinstatement. Nor do we believe that, as the district court suggested, Mr. Bruso's attorney's advocacy on behalf of his client can be a proper basis for such a refusal.

The district court stated that it believed that the tension between Mr. Bruso and United's management went "beyond the underlying litigation." R.87 at 5. It gave, however, no further elaboration. Because the district court

relied on impermissible considerations in its determination that reinstatement was not feasible and gave an inadequate explanation of another factor, we believe that this issue must be reexamined in its entirety by the district court. Accordingly, on remand, the court must reassess whether reinstatement is an appropriate remedy.

2. Front Pay

When reinstating a successful Title VII plaintiff is not feasible, front pay is usually available as an alternative remedy. See Williams v. Pharmacia, Inc., 137 F.3d 944, 951 (7th Cir. 1998). Front pay is designed to place the plaintiff "in the identical financial position that he would have occupied had he been reinstated." Avitia, 49 F.3d at 1231. A plaintiff who seeks an award of front pay must provide the district court "with the essential data necessary to calculate a reasonably certain front pay award." McKnight, 973 F.2d at 1372. "Such information includes the amount of the proposed award, the length of time the plaintiff expects to work for the defendant, and the applicable discount rate." Id. If the plaintiff fails to provide this information to the district court, the court will not abuse its discretion if it denies his request for front pay. See id.; see also Barbour v. Merrill, 48 F.3d 1270, 1279 (D.C. Cir. 1995); Brooms v. Regal Tube Co., 881 F.2d 412, 424 n.9 (7th Cir. 1989), overruled on other grounds, Saxton v. American Tel. & Tel. Co., 10 F.3d 526, 533-34 (7th Cir. 1993); Coston v. Plitt Theatres, Inc., 831 F.2d 1321, 1332-35 (7th Cir. 1987), vacated on other grounds, 486 U.S. 1020 (1988).

United has argued before this court that Mr. Bruso waived his right to front pay by failing to request such an award from the district court. We are satisfied, however, that Mr. Bruso raised this issue sufficiently in the district court. Although Mr. Bruso's request for an award of front pay was rather vague, the district court was apparently aware of the issue: the court explicitly stated in its order denying equitable relief that it did not believe front pay was warranted. This treatment of the issue was sufficient to preserve it on appeal.

However, we must conclude that Mr. Bruso failed to meet his burden of providing the district court with the data necessary to calculate a reasonable front pay award. We can find no indication in the appellate record that Mr. Bruso suggested the amount of an appropriate award or submitted evidence indicating how long he intended to work for United or how the court should determine the applicable discount rate. In accordance with our prior precedent, we must hold that the district court did not abuse its discretion in refusing to award Mr. Bruso front pay.

In any event, by failing to present any reasoned argument on the issue on appeal, Mr. Bruso has waived the issue in this court.

### 3. Personnel Record

Mr. Bruso also asked the district court to expunge from his personnel record all references to United's investigation into his reports of Sporer's sexual harassment and any disciplinary action taken against him as a result of those reports, so that "his record will evidence only what it would have if the unlawful employment practice had not occurred." R.69 at 2. Mr. Bruso also lodged a specific request to have his UG 100 form amended so that his record will not contain any reference to his removal from management./9 Stating that it "refuse[d] to meddle with United's personnel matters," the district court denied Mr. Bruso's request. R.87 at 7. We believe that, in light of the jury's verdict in favor of Mr. Bruso on his retaliatory demotion claim, the district court abused its discretion in denying Mr. Bruso's request.

A district court is given broad discretion to fashion an equitable remedy that makes whole a plaintiff who has been discriminated against by his employer. See EEOC v. Gurnee Inn Corp., 914 F.2d 815, 817 (7th Cir. 1990). A court may use expungement as a means of removing the stain of the employer's discriminatory actions from the plaintiff's permanent work history. See, e.g., Sherkow v. Wisconsin Dep't of Pub. Instruction, 630 F.2d 498, 504 (7th Cir. 1980) (stating that the district court properly ordered the defendant to expunge from the plaintiff's personnel file a poor

performance evaluation written in retaliation for the plaintiff's public exercise of her right to be free from gender discrimination); cf. Knapp v. Whitaker, 757 F.2d 827, 846-47 (7th Cir. 1985) (stating that after the jury found that a school unlawfully had terminated a teacher for engaging in constitutionally protected speech, the district court properly ordered that all documents relating to the constitutionally protected speech and the retaliatory termination be expunged from the teacher's personnel record). By refusing to expunge discriminatory or retaliatory discipline from a successful plaintiff's personnel file, a court may force the plaintiff to bear the brunt of his employer's unlawful conduct for the rest of his working career, which certainly contravenes the goal of making a plaintiff whole through equitable remedies.

Based on the state of the appellate record in this case, we cannot tell exactly what information Mr. Bruso's personnel file contains pertaining to his retaliatory demotion. On remand, the district court must examine Mr. Bruso's personnel record and order the expungement of all reference to the retaliatory demotion.

4. Injunctive Relief

Because Mr. Bruso is still working at United, he asked the district court to enjoin United from any further retaliation against him or any other United employee. The district court denied this request because it found "no evidence that United discourages it[s] employees from complaining about unlawful discrimination or that it engages in systematic retaliation." R.87 at 6. The court found it persuasive that United has internal mechanisms in place to address complaints of harassment, and found it "of no moment" that "those mechanisms may not be 100% effective." Id. at 7.

We previously have stated that a successful discrimination plaintiff need not demonstrate that his employer engages in a pattern or practice of discrimination in order to receive injunctive relief. See EEOC v. Ilona of Hungary, Inc., 108 F.3d 1569, 1578 (7th

Cir. 1997). In fact, a plaintiff need not produce any evidence beyond that going to his particular case before becoming eligible for injunctive relief. See id.; see also EEOC v. Harris Chernin, Inc., 10 F.3d 1286, 1292 (7th Cir. 1993) (citing EEOC v. Goodyear Aerospace Corp., 813 F.2d 1539, 1544 (9th Cir. 1987), for the proposition that the EEOC may not need to produce evidence beyond that pertaining to the individual on whose behalf it sued in order to receive an injunction). The relevant inquiry, then, is whether the employer's discriminatory conduct could possibly persist in the future. See Ilona of Hungary, 108 F.3d at 1578-79; see also Dombeck v. Milwaukee Valve Co., 40 F.3d 230, 238 (7th Cir. 1994) (stating that the district court would not abuse its discretion by entering an injunction when the employer would be free to assign the harasser and the victim to the same working area in the future); Gurnee Inn, 914 F.2d at 817 (holding that the district court properly awarded an injunction when it was possible that the sexual harassment complained of might persist in the future because the manager who was aware of the harassment, but did nothing to prevent it, was still employed by the defendant); cf. Williams v. General Foods Corp., 492 F.2d 399, 407 (7th Cir. 1974) (stating that injunctive relief is inappropriate when there is little likelihood that the discriminatory practice will recur).

Mr. Bruso succeeded in persuading the jury that he was the victim of a retaliatory demotion. United offered no evidence to indicate that it was unlikely to retaliate further against Mr. Bruso in the future. To the contrary, the circumstances indicate that it is possible that United could retaliate in the future. Mr. Bruso is still working for United at O'Hare. Sporer is no longer employed at O'Hare, but King and Strickland, the two individuals who were most influential in Mr. Bruso's demotion, are still employed there. Although United may have formal policies for reporting and addressing harassment, the jury concluded that King, Strickland, Gordon, and potentially others ignored those policies altogether when they chose to demote Mr. Bruso. Contrary to what the district court thought, it is of every moment that United's reporting policies are not 100% effective: if United's upper echelon of management felt free to ignore

United's policies in the past, there is no reason to believe that those same members of management will abide by them in the future. Thus, an injunction prohibiting further retaliation could provide Mr. Bruso with the legal protection to which the jury's verdict entitles him. Therefore, we conclude that the district court abused its discretion in refusing to award any injunctive relief in light of the jury's verdict in favor of Mr. Bruso on his retaliation claim. We remand this issue in order to allow the district court to enter an appropriate injunction.

D. Attorneys' Fees

After the jury returned a verdict in favor of Mr. Bruso, Mr. Bruso moved as a prevailing party for an award of attorneys' fees. The lodestar figure Mr. Bruso submitted, and the amount the district court awarded him, was $393,418.75. United now argues that this amount was exorbitant in relation to the $10,000 award Mr. Bruso received and the $1.05 million award he requested from the jury.

A prevailing party in a Title VII suit is entitled to a reasonable award of attorneys' fees. See 42 U.S.C. sec. 2000e-5(k). The degree of a party's success can bear on the propriety of the amount of the fee award. See Farrar v. Hobby, 506 U.S. 103, 114 (1992). Because we have concluded that the district court erred in not submitting the issue of punitive damages to the jury and in failing to provide Mr. Bruso with any form of equitable relief, we cannot determine the true degree of Mr. Bruso's success in this litigation at this point in time. Therefore, we express no opinion on the propriety of the district court's fee award, as this issue will have to be revisited following the proceedings on remand.

Conclusion

For the reasons stated in this opinion, we affirm the district court's denial of Mr. Bruso's motion for a new trial on the issue of damages and its refusal to award front pay. We reverse the district court's decision insofar as it refused to submit the issue of punitive damages to the jury, refused to expunge Mr. Bruso's

personnel record, and refused to grant Mr. Bruso any injunctive relief. We remand the issue of reinstatement for further consideration. We express no opinion on the propriety of the district court's award of attorneys' fees to Mr. Bruso. We remand this case to the district court for further proceedings consistent with this opinion.

AFFIRMED in part,
REVERSED in part,
and REMANDED

/1  Apparently, Mr. Bruso's suspension was somewhat unconventional. Mr. Bruso and Bolanowski testified that, to their knowledge, no employee had ever been suspended for making an allegation of sexual harassment.

/2 According to Bolanowski's testimony at trial, there were nine witnesses on the original list that were never interviewed. Of those nine, eight were women. The one male witness was the employee who had told King that Sporer did not treat female employees well.

/3 Mr. Bruso admits that the onset of his gallbladder condition was not related to his demotion.

/4 The following is an itemized list of the actual damages Mr. Bruso asked the jury to award him: $8,533.84 in lost wages as a result of his demotion; $7,299 in lost wages for the time he took off work in order to appeal his demotion; $18,978 in lost wages as a result of the additional time he had to take of work in order to recover from his gallbladder surgery; $1,361 in union dues and equipment and uniform costs he had to pay in order to begin work as a ramp serviceman; $2,643.50 he was unable to earn in overtime once he was demoted; and $7,625 for his psychologist's bills.

/5 The parties stipulated at trial that, if called, Mr. Bruso's physician would testify that, had Mr. Bruso still held an administrative position, he would only have needed to take two weeks off following his gallbladder surgery rather than the six months he ultimately took. However, the jury was not bound by this stipulation, and it was free to credit Mr. Bruso's testimony of severe pain over his physician's testimony that he could have returned to work rather quickly.

/6 See Romano v. U-Haul Int'l, 233 F.3d 655, 669 (1st Cir. 2000) (finding ample evidence to support the jury's finding of reckless disregard when the employee who ordered that the plaintiff

be fired was aware of his employer's antidiscrimination policies); Ogden v. Wax Works, Inc., 214 F.3d 999, 1010 (8th Cir. 2000) (finding that the jury could reasonably conclude that a supervisor acted in the face of a perceived risk that his actions would violate federal law when he testified that he was familiar with his employer's antidiscrimination policy and had received extensive training on the antidiscrimination laws); Lowery v. Circuit City Stores, Inc., 206 F.3d 431, 443 (4th Cir. 2000), cert. denied, 68 U.S.L.W. 3775 (U.S. Oct. 2, 2000) (No. 99-1998) (finding sufficient evidence to support the jury's award of punitive damages when the manager who discriminated presumably knew of the federal antidiscrimination laws, because the employer required all managers to attend a training session on them); EEOC v. Wal-Mart Stores, Inc., 187 F.3d 1241, 1246 (10th Cir. 1999) (finding a sufficient evidentiary basis for the jury's award of punitive damages when the store manager who approved the plaintiff's suspension testified that he was familiar with the ADA and its prohibition against discrimination).

/7 See Romano, 233 F.3d at 670 (holding that a written nondiscrimination policy was insufficient to insulate an employer from punitive damages liability when the employer failed to demonstrate that it had attempted to implement the policy by educating its employees or actively enforcing its mandate); Cadena v. Pacesetter Corp., 224 F.3d 1203, 1210 (10th Cir. 2000) ("[E]ven if an employer-defendant adduces evidence showing it maintains on paper a strong non-discrimination policy and makes good faith efforts to educate its employees about that policy and Title VII, a plaintiff may still recover punitive damages if she demonstrates the employer failed to adequately address Title VII violations of which it was aware."); Ogden, 214 F.3d at 1010 (finding that an employer's written sexual harassment policy did not constitute a good faith effort at compliance when the employer minimized the plaintiff's complaints of harassment, conducted a cursory investigation which focused on the plaintiff's performance rather than the harasser's conduct, and forced the plaintiff to resign without imposing any discipline on the harasser); Passantino v. Johnson & Johnson Consumer Prods., Inc., 212 F.3d 493, 517 (9th Cir. 2000) ("[A]n employer must show not only that it has adopted an anti-discrimination policy, but that it has implemented that policy in good faith."); Lowery, 206 F.3d at 446 (stating that an employer's commitment to its written antidiscrimination policy was called into doubt by racially discriminatory attitudes of top executives and the implementation of a promotional system designed to hide race discrim-

ination in promotions); Deffenbaugh-Williams v. Wal-Mart Stores, Inc., 188 F.3d 278, 286 (5th Cir. 1999) (holding that Wal-Mart's policy of encouraging employees to contact management about perceived discrimination did not prevent an award of punitive damages when Wal-Mart failed to respond effectively to the plaintiff's complaints by promising her that it would look into her concerns but instead fired her on pretextual grounds).

/8 We note that other circuits have held that, even after Kolstad, a Title VII plaintiff may obtain punitive damages by showing that the corporate officers who made the discriminatory employment decision were sufficiently senior to be considered proxies for the company. See Passantino, 212 F.3d at 517; Deters v. Equifax Credit Info. Servs., 202 F.3d 1262, 1271 (10th Cir. 2000).

/9 Mr. Bruso explained that a UG 100 form is a "green and white sheet which contains everything there is to know about you." R.111-5 at 853. Mr. Bruso's UG 100 form indicated that he earned $3,163 per month as a supervisor and only $16.49 per hour as a ramp serviceman. There was an additional UG form that indicated that United was "'returning [Mr. Bruso] to last nonmangement company at company request.'" R.111-5 at 854 (testimony of Mr. Bruso).