In the

# United States Court of Appeals

### For the Seventh Circuit

No. 10-2214

MARIA TARA SUTHERLAND,

*Plaintiff-Appellant,*

*v.*

WAL-MART STORES, INC.,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 1:08-cv-1218—**William T. Lawrence**, *Judge.*

ARGUED NOVEMBER 2, 2010—DECIDED JANUARY 21, 2011

Before CUDAHY, FLAUM, and KANNE, *Circuit Judges.*

KANNE, *Circuit Judge.* Maria Sutherland sued Wal-Mart
Stores, Inc., in federal district court. Her allegations
included maintenance of a hostile work environment
based on sex discrimination and retaliation for re-
porting sex discrimination, both in violation of Title VII;
violation of the Indiana Civil Rights Law; battery and
confinement; intentional and negligent infliction of emo-
tional distress; constructive discharge; promissory

estoppel; and negligent retention. The district court granted summary judgment to Walmart as to each of Sutherland's claims. Sutherland appealed the grant of summary judgment as to her hostile work environment and negligent infliction of emotional distress claims. We affirm.

## I. BACKGROUND

Sutherland and Arturo Aguas worked together in the deli section of a Walmart store in Seymour, Indiana. Sutherland worked at Walmart for seven years, often working with Aguas without incident. Each had a good employment record with the company until 2006.

Aguas's tenure at Walmart was not entirely without incident prior to 2006. Sometime during 2003 or 2004, then-Walmart employee Sherri Mullins complained to her supervisor that Aguas had been leering at her and asking personal questions. Two weeks after the supervisor confronted Aguas, Aguas gave Mullins a gift and a card. Mullins again complained to her supervisor; this time, the supervisor successfully warned Aguas off of any further contact with Mullins. Sutherland was unaware of this incident during the time she and Aguas worked together.

On December 11, 2006, Aguas assaulted Sutherland. Aguas convinced Sutherland to enter a cooler in the deli section by telling her she had boxes inside. Once inside, Aguas grabbed Sutherland and tried to kiss her. Though Sutherland rebuffed this attempt, Aguas was not easily

deterred. He next gave Sutherland an inappropriate Christmas card—one intended to be exchanged between romantic partners—then grabbed Sutherland forcefully, kissed her on the lips, and pressed his pelvis against her. As Sutherland tried to retreat, Aguas put his hand inside her shirt and cupped her breast. Sutherland escaped and told two coworkers—Susan Basil and Debbie Lalonde—about the incident. She then left work early.

The next day, December 12, Sutherland reported the assault to a supervisor—Judy Brooks, acting lead of the deli section. Another employee had already reported the incident to Brooks.

Walmart's policy for investigating harassment complaints is to first interview the complaining employee, then to interview any witnesses, and finally to confront the accused employee with all information acquired during the investigation. Upon Sutherland's report, Brooks took Sutherland to assistant store manager Ralph Hixson, and Sutherland provided Hixson a written account of the assault. Hixson then took Brooks and Sutherland to store co-manager Randy Ward. Sutherland—still shaken—could not finish the workday, so she left early. She also called in sick the next day at Hixson's suggestion because she did not feel comfortable working with Aguas. Later in the day, Ward interviewed deli employee Marcella Templeton. He then turned the investigation over to co-manager Steve Langlais.

On December 13, two days after the assault, Langlais interviewed Lalonde. She reported her conversations

with Sutherland about the incident and told Langlais she thought Aguas's Christmas card was inappropriate.

On December 14, Aguas left for an extended vacation in the Phillippines, and Sutherland returned to work. Management again met with Sutherland, and Sutherland provided a detailed written account of the assault. On December 19, Ward interviewed Basil. She described her initial post-assault conversation with Sutherland and told Ward about Aguas's Christmas card.

On January 2, 2007, Aguas returned from vacation. When he returned to work, Langlais questioned Aguas while another manager, Dwayne Wise, acted as a witness. Aguas admitted hugging Sutherland, putting his face against hers, and giving her a gift, but denied touching her inappropriately or giving her an inappropriate card. Ward and Langlais then conducted follow-up interviews with Sutherland and Basil and re-interviewed Aguas to try to confirm Sutherland's allegations.

At the end of the investigation, the store managers could not substantiate Sutherland's allegations of assault. Only Sutherland and Aguas had witnessed the assault, and Aguas denied the most serious accusations. Aguas did admit to embracing Sutherland in the cooler, and other witnesses substantiated Sutherland's report of an inappropriate card. Ward and Langlais concluded these incidents were violations of Walmart's harassment policy. Ward and Langlais decided not to terminate Aguas. Instead, they issued Aguas a Decision-Making Day— Walmart's most severe discipline short of termination.

Aguas's Decision-Making Day was on January 8. The event provided no new information about Sutherland's allegations. On January 9, Langlais met with Sutherland and told her the investigation had concluded. Langlais also told Sutherland that Aguas would be severely reprimanded, but that management could not substantiate her most serious accusations.

During the investigation, but after Aguas returned from vacation, Sutherland was scheduled to work part of her shift in the deli with Aguas. After she expressed her discomfort, Hixson allowed her to leave work early. Hixson and other management then adjusted Aguas's and Sutherland's schedules to minimize their time working together. By the beginning of February, Sutherland's and Aguas's schedules only overlapped for about 90 minutes each week. When their schedules overlapped, Sutherland worked on the meat wall, which is roughly 80 feet from Aguas's position in the deli. Sutherland commented to Hixson that, though happy to be moved, she would have preferred to work even farther from Aguas. Sutherland and Aguas had no further contact during the length of their respective employments. In fact, Sutherland later reported that Aguas had intentionally avoided her after the assault.

On January 11, Sutherland reported the assault to the local police department. The police interrogated Aguas, who admitted to Sutherland's allegations after failing a lie detector test. Aguas later pled guilty to a charge of sexual battery. On or about March 6, the police provided Walmart with a report of their findings. Ward then

hired an outside investigator to revisit the investigation. During an interview with this investigator on April 17, 2007, Aguas admitted to the allegations and to lying during Walmart's initial investigation. Walmart terminated Aguas that day.

In May 2007, Sutherland took a medical leave of absence for post-traumatic stress disorder. In November 2007, she was granted additional leave under the Family Medical Leave Act. By May 2008, Sutherland had not returned to work, and her Family Medical Leave Act leave had expired. Walmart terminated her employment on May 15, 2008.

Sutherland brought various state and federal claims against Walmart in federal district court. The district court granted Walmart's motion for summary judgment as to all of Sutherland's claims. Sutherland appeals the grant of summary judgment as to her hostile work environment and negligent infliction of emotional distress claims.

## II. ANALYSIS

We review the district court's grant of summary judgment *de novo*, construing all facts and drawing all reasonable inferences in favor of the nonmoving party. *Forrest v. Prine*, 620 F.3d 739, 742-43 (7th Cir. 2010). Summary judgment is appropriate when the full record shows that there is "no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2).

*A. Hostile Work Environment*

To demonstrate a hostile work environment under Title VII, Sutherland must show that she was subjected to harassment because of her sex, that the harassment was severe or pervasive enough to create a hostile work environment, and that there is a basis for employer liability. *Erickson v. Wis. Dep't of Corr.*, 469 F.3d 600, 604 (7th Cir. 2006). We, like the district court, assume Sutherland has provided evidence of harassment because of her sex that was severe enough to create a hostile work environment. To survive summary judgment, then, Sutherland needed only to introduce evidence to allow a jury to reasonably infer a basis for employer liability. Sutherland argues two bases for Walmart's liability: (1) failure to prevent the assault and (2) failure to promptly and reasonably investigate and remedy the assault.

*1. Failure to Prevent the Assault*

Without citing any case supporting her theory, Sutherland argues Walmart is liable because it knew or should have known Aguas was dangerous to women, but it did not prevent Aguas from harassing Sutherland. Doing so, Sutherland ignores this court's opinion in *Longstreet v. Ill. Dep't of Corr.*, 276 F.3d 379 (7th Cir. 2002). In *Longstreet*, we rejected the plaintiff's argument that her employer should be liable because it was put on notice by prior complaints about the harasser. *Id.* at 383. We explained the employer was not liable for an instance of severe harassment merely because the employer had

notice of "one prior incident which may or may not rise to the level of actionable harassment and which was not ignored by the employer." *Id.*

The facts here are strikingly similar to those in *Longstreet*. Here, Sutherland presented evidence that, years prior to the assault, former-employee Mullins complained Aguas had been "leering" at her and had given her an unwelcome gift and card. Though management had to warn Aguas twice, he heeded the second warning and left Mullins alone. Mullins almost certainly alleged no behavior rising to the level of actionable harassment. And Walmart responded reasonably and effectively with two verbal warnings. Sutherland does not attempt to distinguish *Longstreet*, and we reject her argument of employer liability based on notice of prior employee conduct.

### 2. *Delayed and Inadequate Response*

An employer may be liable for a hostile work environment created by employees when the employer does not promptly and adequately respond to employee harassment. *Porter v. Erie Foods Int'l, Inc.*, 576 F.3d 629, 636 (7th Cir. 2009). Sutherland argues Walmart's response to her allegations was neither prompt nor adequate.

Walmart's investigation was sufficiently prompt. Despite Sutherland's assertion that Walmart "waited almost three days" to begin its investigation, the record reveals that it began its investigation the day it received Sutherland's complaint by interviewing Suther-

land and fellow deli employee Templeton. Walmart went on to interview several other deli employees before confronting Aguas on the day he returned from vacation. Walmart did not question Aguas immediately after learning of Sutherland's accusation because company policy for investigating harassment provides that management should confront the alleged harraser only after acquiring all information available from other sources. Walmart conducted a prompt investigation in compliance with company policy. Accordingly, Walmart is not liable for failure to promptly investigate Sutherland's claims.

While promptness is a virtue, an employer must also provide an appropriate response to an employee's complaints of harassment. *Lapka v. Chertoff*, 517 F.3d 974, 984 (7th Cir. 2008). To avoid liability, the employer must respond in a manner reasonably likely to end the harassment. *Porter*, 576 F.3d at 637. We do not ignore hindsight, but the ultimate question is whether the response was likely to succeed *ex ante*. *See id.* ("There is no question that a stoppage of harassment shows effectiveness . . . . However, this is not the sole factor to be considered." (internal quotation marks omitted)).

Sutherland argues Walmart should have responded more forcefully to her accusations—it should have fired Aguas or at least separated Aguas and Sutherland by a distance greater than 80 feet. But the steps Walmart failed to take are only relevant if the steps it actually took were not reasonably likely to end the harassment. *Id*.

We have previously held that, in some circumstances, creating physical separation and minimizing time worked together are steps reasonably likely to end harassment. *See Roby v. CWI, Inc.*, 579 F.3d 779, 786 (7th Cir. 2009) (concluding that reprimanding harasser and re-working schedule to avoid leaving harasser and plaintiff alone together were "more than reasonable" responses); *Berry v. Delta Airlines, Inc.*, 260 F.3d 803, 806, 813 (7th Cir. 2001) (holding that employer had responded reasonably to accusations of harassment when the employer arranged harasser's and plaintiff's schedules so they would only work together 90 minutes each day, even though plaintiff and harasser often had contact during this time). Walmart's responses here—reprimanding Aguas, limiting overlap between Aguas's and Sutherland's schedules, and reassigning Sutherland to the meat wall when she and Aguas were both scheduled to work in the deli—were reasonably likely to end Aguas's harassment. As it turned out, Aguas did not further harass Sutherland. Rather, Aguas intentionally avoided Sutherland after being reprimanded.

Sutherland argues that, because of Walmart's notice of a prior complaint against Aguas, Walmart should be held to a higher standard than other employers who receive complaints of harassment. In other words, because Walmart had notice that Aguas was potentially dangerous, it should have believed her complaint and taken more drastic remedial measures. Assuming Walmart had notice of Mullin's complaint from 2003 or 2004, Walmart's response was still adequate. Mullins complained that Aguas gave her unwelcome attention

and an unwelcome gift and card. Knowledge of this past complaint should not have made Walmart suspicious of Aguas's initial statement—that he hugged Sutherland, touched her face, and gave her a card. While Mullins's complaint may have put Walmart on notice that Aguas was likely to engage in inappropriate workplace behavior, it did not give notice that Aguas was likely to engage in the degree of inappropriate behavior—namely, sexual assault—Sutherland described in her complaint.

## C. *Negligent Infliction of Emotional Distress*

Sutherland also presents an undeveloped argument that Walmart should be liable for negligent infliction of emotional distress. She does not clearly argue Walmart negligently allowed the assault to occur, but we would have rejected this argument because Walmart had no notice that Aguas was likely to assault Sutherland or anyone else. Sutherland also does not clearly argue Walmart's post-assault actions give rise to a claim of negligent infliction of emotional distress, but we would have rejected this argument too. For despite the obfuscating arguments in Sutherland's brief, Indiana law requires a showing of physical impact for recovery based on negligent infliction of emotional distress. *Ross v. Cheema*, 716 N.E.2d 435, 436-37 (Ind. 1999) (explaining that Indiana law "maintains the requirement of a direct impact" and that "the direct impact sustained by the plaintiff must necessarily be a 'physical' one"). Sutherland does not claim to have sustained any physical impact because of

Walmart's post-assault actions, so her negligent inflic-
tion of emotional distress claim is meritless.

### III. CONCLUSION

Sutherland did not present evidence that would allow
a jury to conclude Walmart is liable for the assault com-
mitted against her by Aguas. Therefore, we AFFIRM the
district court's grant of summary judgment in favor of
Walmart.