In the

# United States Court of Appeals

### For the Seventh Circuit

No. 10-3862

SAMUEL MILLIGAN,

*Plaintiff-Appellant*,

*v.*

BOARD OF TRUSTEES OF
SOUTHERN ILLINOIS UNIVERSITY,

*Defendant-Appellee*.

Appeal from the United States District Court
for the Southern District of Illinois.
No. 09 CV 320—**J. Phil Gilbert**, *Judge*.

ARGUED DECEMBER 2, 2011—DECIDED JULY 10, 2012

Before RIPPLE and ROVNER, *Circuit Judges*, and
FEINERMAN, *District Judge*.[*]

FEINERMAN, *District Judge*. Samuel Milligan, then a
freshman at Southern Illinois University ("SIU"), had

[*] The Honorable Gary Feinerman, of the Northern District of
Illinois, sitting by designation.

three uncomfortable encounters with Dr. Cal Meyers—a professor emeritus at, and substantial donor to, SIU—in which Meyers touched Milligan inappropriately and complimented him on what Meyers believed to be his feminine features. Milligan sued SIU under Title VII and Title IX for creating a hostile work and educational environment and also for retaliating against him for complaining about Meyers' harassment. The district court granted summary judgment to SIU, Milligan appealed, and we affirm.

## I. Background

The procedural posture requires us to state the facts as favorably to Milligan as the record permits. See *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 631 (7th Cir. 2011). We emphasize that no endorsement of any fact regarding Meyers—who, as a non-party, has had no occasion in this case to dispute Milligan's accusations—is intended.

Milligan enrolled at SIU in Fall 2007 as a chemistry major. He decided to participate in SIU's student employment program and was hired by Chris Kraft to work in the chemical stockrooms at Neckers Hall, the home of the Chemistry Department. Meyers was a seventy-nine-year-old professor emeritus and Director of the eponymous Meyers Institute for Interdisciplinary Research in Organic and Medicinal Chemistry, which had been established in 2000 with a $2.5 million donation from Meyers. Meyers no longer taught students and had no supervisory or other authority over Milligan.

On October 4, 2007, when Milligan was working in the first floor stockroom, which was directly across the hall from Meyers' office, Milligan encountered Meyers in the hallway. Meyers told Milligan that his hair would make him "a very sexy lady," and then giggled and squeezed Milligan's buttocks. The encounter lasted four to five seconds. Milligan reported the incident to Kraft, his supervisor, who said that this sounded like something Meyers would do. Kraft asked Milligan if he wanted to talk to someone about the incident and offered to accompany Milligan if he did. Milligan declined. At that time, SIU's sexual harassment policy required any supervisor who received a written or oral complaint to "take necessary action to resolve the complaint promptly" and to consult the Affirmative Action Office to determine the appropriate course of action.

On October 11, 2007, Meyers approached Milligan in the stockroom and asked where he could rent hair like Milligan's because it would look "pretty sexy on a lady." Meyers said that he would date Milligan if he were a woman, laughed, and then left. The encounter lasted about twenty to thirty seconds. After learning of this encounter, Milligan's mother called the Chemistry Department and arranged to meet the next day with Dr. Gary Kinsel, the Department Chair. Prior to the meeting, Kinsel notified Dr. John Koropchak—the Vice Chancellor for Research and Graduate Dean, and the individual responsible for supervising the Meyers Institute—of the situation.

At his meeting with the Milligans, Kinsel said that Meyers was an old man with a compromised mental

state who could not be held accountable for his actions, that he had once been a greatly admired scientist and an asset to the university, and that he had no family and that SIU was his life. Kinsel added that while he had no disciplinary authority over Meyers, Koropchak did have that authority and would meet with the Milligans as soon as he could. Kinsel reviewed SIU's sexual harassment policy with the Milligans. Kinsel was not familiar with the policy before the meeting and incorrectly believed that sexual harassment complaints must be submitted in writing. Milligan found Kinsel to be receptive to his complaint and did not believe that Kinsel was brushing him off.

Milligan's mother then contacted Marcia Phelps from SIU's Affirmative Action and Equal Employment Opportunity Office. Phelps encouraged Milligan's mother to meet with Koropchak and to tell him that they wished to proceed with a formal complaint. Phelps also asked Milligan's mother to call back after the meeting with Koropchak.

In the meantime, Kinsel and Kraft assigned Milligan to the second floor stockroom, where he had worked prior to the first incident with Meyers and where he would be less likely to encounter Meyers. Milligan did not object to the assignment and worked the same number of hours. On October 16, 2007, however, Milligan encountered Meyers on the stairs between the first and second floors. Meyers giggled and told Milligan that he would "look sexy as a girl" because of his hair. Meyers also grabbed Milligan near the belt line with his index

finger and thumb; because Milligan wore his jeans low, the grab "was very close to [his] genital area" and made him "very uncomfortable." The encounter lasted about six seconds.

Koropchak's meeting with the Milligans took place a day later. At the outset, Koropchak told them about Meyers' great stature at SIU and the $2.5 million donation. After Milligan detailed Meyers' inappropriate behavior, Koropchak asked whether there were any witnesses, and Milligan responded that there were none. Koropchak told Milligan that it would be his word against Meyers' and asked Milligan four or five times whether he was sure that he wanted to proceed with a formal complaint. The Milligans felt that Koropchak's statements and questions implied that he was disinterested, did not believe them, and wanted them to drop the complaint. But Milligan insisted on pursuing a complaint, and Koropchak said that he would begin an investigation and advised Milligan to avoid Meyers in the interim.

Shortly after the meeting, Koropchak met with Meyers and told him that a student had complained and that his behavior would be monitored. On October 26, the Milligans contacted Lynn Connley, an SIU ombudsman, to inquire about the investigation. Connley checked in with Koropchak, but before Connley could call the Milligans back, Koropchak contacted the Milligans to give them an update.

During his investigation, Koropchak learned that Meyers had previously harassed a female Chemistry Department employee. The employee said that Meyers

"constantly comment[ed] about [her] clothing" and touched her in an "inappropriate" manner several times, including grabbing her by the waist, rubbing his head against her body, and poking her breast. The employee, however, had declined to pursue a formal complaint against Meyers.

At the conclusion of his investigation of Milligan's complaint, Koropchak concluded that Meyers had violated SIU's sexual harassment policy and, on November 8, 2007, issued a letter of reprimand. The letter directed Meyers to cease all contact with student workers and to attend sexual harassment training by December 1, 2007. The letter warned Meyers that future violations or failure to comply with the letter could result in his termination as Director of the Meyers Institute and revocation of his university privileges.

Meyers then commenced efforts to determine who had reported him. He offered money to Kraft, but Kraft refused to tell. On January 28, 2008, Meyers asked Milligan whether he had complained; Milligan mumbled and excused himself. The next day, Milligan's mother told SIU about that encounter. SIU also discovered that Meyers had not completed the sexual harassment training. (While Meyers may have attempted to negotiate away the training requirement, there is no evidence that SIU relieved him of that obligation.) In a letter dated January 31, 2008, SIU Chancellor Fernando Treviño banned Meyers from campus pending completion of a new investigation and warned that he would be subject to arrest for trespassing if he appeared on

university property. Milligan saw Meyers on campus over twenty times after the ban was imposed. SIU's public safety personnel escorted Meyers off campus each time they became aware of his presence but, on instructions from the Director of Public Safety, he was not arrested.

In February or March 2008, Milligan decided to change his major from chemistry to creative writing. One motivating factor was his desire to get out of Neckers Hall, where he continued to see Meyers. In April 2008, Kraft informed Milligan that he could not continue to work in the chemical stockrooms come Fall 2008. Kraft testified that his decision was prompted by Milligan's waning interest in the job and poor work performance. Milligan had requested fewer hours to allow him to study more, leaving him with only one working day per week. Making matters worse, Milligan had called in sick two times and missed one day without notifying Kraft, and also had an accident with a liquid nitrogen canister. Milligan was able to gain university employment in Fall 2008 with the Graduate School's admissions office and the university's ticket office.

The foregoing events gave rise to two lawsuits. In August 2008, Meyers brought suit against SIU and Koropchak, alleging violations of federal and state law related to the sexual harassment investigation and Meyers' expulsion from campus. See *Meyers v. S. Ill. Univ.*, No. 3:08-cv-556-MJR-CJP (S.D. Ill.). The district court dismissed Meyers' suit, see *Meyers v. S. Ill. Univ.*, 2009 WL 3719392 (S.D. Ill. Nov. 5, 2009); *Meyers v. S. Ill. Univ.*, 2009

WL 2046061 (S.D. Ill. July 10, 2009), and an appeal of that judgment is pending in No. 09-3931.

In April 2009, Milligan brought this suit against SIU under Title VII for subjecting him to a hostile work environment, under Title IX for subjecting him to a hostile educational environment, and under both statutes for terminating him from his chemical stockroom job in retaliation for complaining about Meyers. The district court granted summary judgment to SIU on all claims. 2010 WL 2649917 (S.D. Ill. June 30, 2010), *reconsideration denied*, 2010 WL 4818387 (S.D. Ill. Nov. 16, 2010). This appeal followed.

## II.  Discussion

### A.  Hostile Work/Educational Environment Claims

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). To succeed on his Title VII hostile work environment claim against SIU, Milligan must prove "(1) that [his] work environment was both objectively and subjectively offensive; (2) that the harassment was based on [his sex]; (3) that the conduct was either severe or pervasive; and (4) that there is a basis for employer liability." *Vance v. Ball State Univ.*, 646 F.3d 461, 469 (7th Cir. 2011). Assuming without deciding that Milligan adduced evidence sufficient to satisfy the first three elements, his claim falters on the fourth.

Because Meyers was not Milligan's supervisor, SIU can be held liable for Meyers' harassment only if Milligan proves that SIU was "negligent either in discovering or remedying the harassment." *Id*. at 470; see generally *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998). An employer is negligent if it does not "promptly and adequately respond to [the] harassment." *Sutherland v. Wal-Mart Stores, Inc.*, 632 F.3d 990, 994 (7th Cir. 2011). "[W]hat is [a] reasonable [response] depends on the gravity of the harassment. . . . [A]n employer is required to take more care, other things being equal, to protect its . . . employees from serious sexual harassment than to protect them from trivial harassment." *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 431-32 (7th Cir. 1995); see also *Erickson v. Wis. Dep't of Corr.*, 469 F.3d 600, 606 (7th Cir. 2006). While Meyers' demeaning comments and touching might be enough to constitute severe or pervasive harassment under Title VII, they did not rise to the level (e.g., sexual assault or sexual *quid pro quo*) that would have required SIU to take drastic action, such as a same-day investigation and termination of Meyers. See *Smith v. Sheahan*, 189 F.3d 529, 535 (7th Cir. 1999); *McKenzie v. Ill. Dep't of Transp.*, 92 F.3d 473, 481 (7th Cir. 1996); *Baskerville*, 50 F.3d at 432. Given the facts and circumstances before it, SIU's response was appropriately prompt and entirely reasonable.

Kraft was the first university official to learn of the harassment. He offered to accompany Milligan to talk to other university officials about the incident, but Milligan declined. Kraft's decision not to pursue the matter was

reasonable in light of Milligan's declination. See *Jackson v. Cnty. of Racine*, 474 F.3d 493, 501-02 (7th Cir. 2007) (holding that an employer did not act unreasonably where it had notice of a supervisor's sexual harassment but took no action for three months because no victim wished to lodge a formal complaint). Kinsel was the next university official to be informed. Because he had no authority over Meyers, Kinsel immediately notified Koropchak, who did have that authority. Kinsel also arranged with Kraft to have Milligan work in the second floor stockroom instead of the first floor stockroom, which was across the hall from Meyers' office; this is significant, as Milligan had experienced no negative encounters with Meyers while working in the second floor stockroom. Koropchak met with Milligan and his mother five days later. When Milligan decided to pursue his complaint, Koropchak immediately warned Meyers and conducted an investigation; three weeks later, Koropchak issued a letter of reprimand, requiring Meyers to attend sexual harassment training and forbidding him from contact with student workers. When SIU later learned that Meyers had contacted Milligan and had not completed training, the Chancellor banned Meyers from campus. And when Meyers continued to appear on campus, the university police removed him.

SIU's response is on par with employer responses held reasonable in several of our cases. See *Sutherland*, 632 F.3d at 995 (where the employer reprimanded the harasser and ensured that the harasser's and the harassed's schedules overlapped only ninety minutes per

week); *Roby v. CWI, Inc.*, 579 F.3d 779, 786 (7th Cir. 2009) (where the employer required the harasser to attend training classes and minimized the overlap between the harasser's and the harassed's work schedules); *Berry v. Delta Airlines, Inc.*, 260 F.3d 803, 812-13 (7th Cir. 2001) (where the employer investigated the allegations and, within a month, required the harasser to watch a training video and ensured that the harasser's and the harassed's work schedules overlapped only ninety minutes per day); *McKenzie*, 92 F.3d at 480-81 (where the employer issued a memorandum to all employees regarding sexual harassment and prohibited the harasser from contacting the harassed); *Saxton v. AT&T Co.*, 10 F.3d 526, 535-36 (7th Cir. 1993) (where the employer completed the investigation in two weeks and took action within five weeks, transferring the harasser to a different department). Milligan offers three reasons why this case warrants a different result. Each fails to persuade.

First, Milligan contends that Kinsel and Koropchak attempted to discourage him from pursuing his complaint against Meyers. Kinsel told the Milligans that Meyers once had been a great professor and could not be held responsible for his conduct due to his compromised mental state; Koropchak asked Milligan whether there were any witnesses to the alleged harassment, made him repeatedly affirm that he wanted to pursue a complaint, and emphasized Meyers' importance to SIU. Drawing reasonable inferences in Milligan's favor, the record supports the notion that Kinsel and Koropchak attempted to discourage Milligan from pur-

suing the matter because it would embarrass and harm an important member of the university community.

In some cases, such discouragement might be sufficient to render an employer's response unreasonable, especially if coupled with a stalled or biased investigation. See *Vance*, 646 F.3d at 472 (the reasonableness of an employer's investigation may be a jury question where the investigation was biased, with "all ties [going] to the discriminator"); *Porter v. Erie Foods Int'l, Inc.*, 576 F.3d 629, 636 (7th Cir. 2009) ("a prompt investigation is the hallmark of a reasonable corrective action") (internal quotation marks omitted); *Smith*, 189 F.3d at 535 ("Just as an employer may escape liability even if harassment recurs despite its best efforts, so it can also be liable if the harassment fortuitously stops, but a jury deems its response to have fallen below the level of due care."). Not so here. The record indisputably shows that two other SIU officials were quite helpful in shepherding the Milligans through the complaint process. Phelps, from the Affirmative Action and Equal Employment Opportunity Office, provided guidance regarding the complaint process and encouraged the Milligans to pursue a formal complaint. Connley, the ombudsman, counseled Milligan and served as an intermediary between Koropchak and Milligan. Moreover, despite their apparent discouragement of Milligan's complaint, Kinsel's and Koropchak's responses were otherwise reasonable and effective.

Regardless of what he said *at* his meeting with the Milligans, Kinsel set the investigative machinery

in motion *before* the meeting by referring Milligan's allegations to Koropchak, the official with disciplinary authority over Meyers. Kinsel also arranged for Milligan to work exclusively in the second floor stockroom, away from Meyers' office on the first floor. For his part, after confirming that Milligan wished to proceed, Koropchak immediately warned Meyers and promptly investigated the matter, completing the investigation and taking remedial action about three weeks later. See *Porter*, 576 F.3d at 636. The record indisputably shows that neither Kinsel nor Koropchak stalled SIU's handling of Milligan's charge in any way. Also, the record contains no evidence that the investigation was biased against Milligan. Cf. *Vance*, 646 F.3d at 472. To the contrary, SIU vindicated Milligan's complaint by determining that Meyers had violated its sexual harassment policy, by prohibiting him from contact with students, and, when Meyers refused to comply, by banning him from campus. Cf. *EEOC v. Mgmt. Hospitality of Racine, Inc.*, 666 F.3d 422, 434-36 (7th Cir. 2012) (holding that management's failure to investigate and report incidents of sexual harassment made the employer's response unreasonable).

Second, Milligan contends that SIU's response was ineffective because it did not prevent all contact between him and Meyers. This argument fails because SIU was not required to completely insulate Milligan from Meyers. See *Sutherland*, 632 F.3d at 995 (holding that the employer's response was reasonable even where the harassed employee periodically had to work in the harasser's general vicinity); *Roby*, 579 F.3d at 786 (same); *Berry*, 260 F.3d at 813 (same). Rather, the law required

only that SIU's response be "reasonably likely to pre-
vent future harassment." *Parkins v. Civil Constructors
of Ill., Inc.*, 163 F.3d 1027, 1036 (7th Cir. 1998); see also
*Vance*, 646 F.3d at 471; *Saxton*, 10 F.3d at 536 ("Whatever
reasons there might be for the company's failure to
take additional steps . . . are irrelevant absent evidence
suggesting that the [action taken] was not reasonably
likely to prevent the harassment from recurring."). As
the above-cited precedents establish, the assignment
of Milligan to the second floor stockroom, the repri-
mand, the training requirement, and the good faith
efforts to minimize Meyers' contact with Milligan were
sufficient under the circumstances. In fact, after
Koropchak's meeting with the Milligans, Milligan
suffered no further sexual harassment. See *Porter*, 576
F.3d at 637 ("There is no question that a stoppage of
harassment shows effectiveness.") (internal quotation
marks omitted); *Smith*, 189 F.3d at 535.

   Nor is there any evidence that SIU's response was
an unenforced sham. When SIU discovered that Meyers
had not completed the required sexual harassment
training and had contacted Milligan to ask whether he
was the complainant, the Chancellor punished Meyers
further, banning him from campus. SIU enforced this
ban and removed Meyers from campus whenever he
was seen. At most, SIU might be faulted for not
following up sooner to see if Meyers had completed the
training. Still, SIU's overall response—the investigation,
the prohibition on contact with students, the imposi-
tion of the training requirement, and, ultimately, the ban
from campus—comprised a reasonable response to the

events as they unfolded. See *Saxton*, 10 F.3d at 536. No reasonable jury could find that SIU's failure to immediately learn of Meyers' noncompliance with the training requirement rendered its response patently ineffective or a sham.

Our dissenting colleague maintains that a jury could find that Koropchak's letter of reprimand was an insufficient response in light of Meyers' "earlier history of untoward conduct, a history that had persisted despite an earlier letter of reprimand, an earlier encounter with another student and numerous other informal complaints by staff members." Dissenting op. 28-29. We doubt that Meyers' alleged history of improper conduct is properly considered in evaluating the reasonableness of SIU's response. As an initial matter, Milligan's appellate brief affirmatively maintains that "Milligan is the only person who complained of sexual harassment by Dr. Meyers." Milligan Br. 12; *see also id*. at 11, 18 (arguing that evidence regarding Meyers' supposed harassment of a female Chemistry Department employee is "inadmissible hearsay"). It is true, as the dissent observes, that Milligan made this point in addressing a different issue, i.e., whether Meyers was an "equal opportunity" harasser and thus whether his harassment of Milligan was based on sex. But still, having argued for *that* purpose that he was "the only person who complained of sexual harassment by Dr. Meyers," it would have lain poorly in Milligan's mouth to switch gears and argue, for the purpose of challenging the adequacy of SIU's response to his situation, that he was *not* the only person to have complained of Meyers' harassment.

As it turns out, Milligan did not make that argument, either here or in the district court. His failure to do so forfeits the argument. See *Escobar v. Holder*, 657 F.3d 537, 548 (7th Cir. 2011) ("the government did not argue this and so this point is forfeited"); *United States v. Bullock*, 632 F.3d 1004, 1014 n.1 (7th Cir. 2011) ("because the government did not argue that there was probable cause to justify the pre-search detention, . . . it has forfeited that argument."). The dissent maintains that there is no forfeiture because "Milligan raised adequately the argument that the University's response to Meyers's attacks was inadequate . . ." Dissenting op. 29 n.4. But as we have held on several occasions, the forfeiture doctrine applies not only to a litigant's failure to raise a general argument—here, that SIU's response was inadequate, rendering it liable for Meyers' harassment—but also to a litigant's failure to advance a specific point in support of a general argument—here, that SIU's response was inadequate due, in part, to Meyers' earlier history of untoward conduct. See *Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012) ("We have also recognized that raising an issue in general terms is not sufficient to preserve specific arguments that were not previously presented.") (citing *Fednav Int'l Ltd. v. Cont'l Ins. Co.*, 624 F.3d 834, 841 (7th Cir. 2010)); *Hannemann v. S. Door Cnty. Sch. Dist.*, 673 F.3d 746, 754 (7th Cir. 2012) ("a party 'waive[s] the ability to make a specific argument for the first time on appeal when the party failed to present that specific argument to the district court, even though the issue may have been before the district court in more general terms'") (quoting *Fednav Int'l Ltd.*, 624 F.3d at 841) (alteration in

original); *Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011) ("[w]e apply [the forfeiture] rule where a party fails to develop arguments related to a discrete issue"); *Domka v. Portage Cnty., Wis.*, 523 F.3d 776, 783 n.11 (7th Cir. 2008) (citing *Libertyville Datsun Sales, Inc. v. Nissan Motor Corp.*, 776 F.2d 735, 737 (7th Cir. 1985), for the proposition that "where a party raises a specific argument for the first time on appeal, it is waived even though the 'general issue' was before the district court"); *4901 Corp. v. Town of Cicero*, 220 F.3d 522, 529 (7th Cir. 2000) (same).

In any event, whatever history of "untoward conduct" Meyers might have had did not render Koropchak's reprimand letter an insufficient response to the situation before him. In 1995, Koropchak issued a letter of reprimand to Meyers for telling offensive jokes that may have been sexual in nature. The record contains no evidence of any other inappropriate conduct until 2005, when several students and staff members informally complained about Meyers' behavior. However, it appears from the record that those students and staff members—including the female Chemistry Department employee referenced above—declined to pursue their complaints. Against this backdrop, Koropchak's decision to issue a reprimand letter was reasonably likely to prevent future harassment. After all, the 1995 letter had been effective—it curbed offensive behavior by Meyers for ten years.

Third, Milligan notes that Kraft, Kinsel, and Koropchak were poorly versed in SIU's sexual harassment policy

and did not follow it properly. While that appears to be true to some degree, "[o]ur focus . . . is on whether [SIU] responded promptly and effectively to the incident," *Porter*, 576 F.3d at 636, not on whether it complied with its own internal policy. The failure to follow internal policy does not matter so long as the employer's response is otherwise reasonable under Title VII, which it was here. See generally Restatement (Third) of Torts: Phys. & Emot. Harm. § 13 cmt. f (2010) (evidence of internal standards "does not set a higher standard of care for the actor").

In holding that SIU is entitled to judgment on the Title VII claim, we acknowledge and share our dissenting colleague's concern with the vulnerability of Milligan and student workers like him. That said, the approach recommended by the dissent—made manifest by its suggestion that although SIU's actions might have been sufficient in some employment situations, it was insufficient where the plaintiff is a student working on a college campus—would threaten to carve a higher standard of protection for student workers than for other plaintiffs. We do not believe it is necessary to take this step. A breach of trust in a student work environment indeed can have dire consequences, but so can breaches of trust in a myriad of situations, such as those involving interns, probationary workers, recent hires desperate to attain long-term employment, or more experienced workers not wanting to jeopardize their pensions. Many if not most harassment cases involve allegations that someone in a position of power harassed someone else for whom job retention is an important if

not paramount consideration. The ordinary standards governing sexual harassment claims take account of this dynamic, and thus need no modification when the plaintiff is a student worker.

Because summary judgment is warranted under Title VII, the Title IX harassment claim requires little discussion. SIU can be held liable under Title IX for Meyers' harassment only if it acted with "deliberate indifference." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998); see also *Doe-2 v. McClean Cnty. Unit Dist. No. 5 Bd. of Dirs.*, 593 F.3d 507, 512 (7th Cir. 2010). Deliberate indifference is a more exacting standard than the negligence standard governing employer liability under Title VII. *See Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011) ("Deliberate indifference is more than negligence and approaches intentional wrongdoing.") (internal quotation marks omitted). Thus, the fact that SIU's response was reasonable under Title VII necessarily absolves it of liability under Title IX.

## B. Retaliation Claims

Title VII forbids an employer from discriminating against an employee who "opposed any practice" prohibited by Title VII or who "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a). "The antiretaliation provision seeks to prevent employer interference with 'unfettered access' to Title VII's remedial mechanisms . . . by prohibiting employer actions that are likely 'to deter victims of discrimi-

nation from complaining to the EEOC,' the courts, and their employers." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997)). Title IX's prohibition on discrimination "on the basis of sex" likewise covers "retaliat[ion] against a person *because* he complains of sex discrimination." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174 (2005).

Milligan may forestall summary judgment on his Title VII retaliation claim through the direct or indirect methods of proof. See *Turner v. The Saloon, Ltd.*, 595 F.3d 679, 687-88 (7th Cir. 2010). Milligan pursues only the direct method on appeal. Under that method, Milligan "must present evidence of (1) a statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the two." *Id.* at 687 (internal quotation marks omitted); see also *Coleman v. Donahoe*, 667 F.3d 835, 859 (7th Cir. 2012). The Title VII retaliation framework applies with equal force to retaliation claims brought under Title IX. See *Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 91 (2d Cir. 2011); *Lucero v. Nettle Creek Sch. Corp.*, 566 F.3d 720, 728-30 (7th Cir. 2009); *Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 67 (1st Cir. 2002). The district court correctly held that Milligan's retaliation claims founder on the third element, causation.

Milligan can establish causation at the summary judgment stage by showing that his complaints about Meyers "were a substantial or motivating factor" in SIU's decision to inform Milligan in April 2008 that he could not

return to his chemical stockroom position in Fall 2008. *Leitgen v. Franciscan Skemp Healthcare, Inc.*, 630 F.3d 668, 675 (7th Cir. 2011) (internal quotation marks omitted). "This may be done via direct evidence, which would entail something akin to an admission by the employer ('I'm firing you because you had the nerve to accuse me of sex discrimination!')." *Coleman*, 667 F.3d at 860 (some internal quotation marks omitted); see also *Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1114 (7th Cir. 2009). Direct evidence is "rare indeed," *ibid.*, and Milligan presents none here. Causation also may be established "by presenting a 'convincing mosaic' of circumstantial evidence that would permit the same inference [of retaliation] without the employer's admission." *Coleman*, 667 F.3d at 860 (some internal quotation marks omitted). Such circumstantial evidence may consist of (1) "suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of causation might be drawn," (2) "evidence showing that the employer systematically treated other, similarly situated . . . employees better," or (3) "evidence that . . . the employer's justification [for the adverse action was] pretextual." *Silverman v. Bd. of Educ. of City of Chicago*, 637 F.3d 729, 734 (7th Cir. 2011) (internal quotation marks omitted); see also *Coleman*, 667 F.3d at 860. The appropriate focus "is not whether the evidence offered is direct or circumstantial but rather whether the evidence points directly to a discriminatory reason for the employer's action." *Atanus v. Perry*, 520 F.3d 662, 671 (7th Cir. 2008) (internal quotation marks

omitted); see also *Davis v. Time Warner Cable of Se. Wis., L.P.*, 651 F.3d 664, 672 (7th Cir. 2011).

Milligan relies on three pieces of circumstantial evidence to establish causation: (1) the suspicious timing between his October 2007 and January 2008 complaints about Meyers, on the one hand, and Kraft's informing him in April 2008 that he would not be retained in the chemical stockrooms in Fall 2008, on the other; (2) the fact that SIU hired him to work in the Graduate School's admissions office and the university's ticket office in Fall 2008 despite his supposedly poor performance in the chemical stockrooms; and (3) the fact that Milligan is the only student for whom Kraft ever conducted a performance review. Milligan forfeited any reliance on the second and third pieces of evidence because he did not raise them in his district court brief opposing summary judgment. See *Liberles v. Cook Cnty.*, 709 F.2d 1122, 1126 (7th Cir. 1983) ("It is a well-settled rule that a party opposing a summary judgment motion must inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered. If it does not do so, and loses the motion, it cannot raise such reasons on appeal."); see also *Chi. Reg. Council of Carpenters v. Vill. of Schaumburg*, 644 F.3d 353, 356 (7th Cir. 2011) (same); *India Breweries, Inc. v. Miller Brewing Co.*, 612 F.3d 651, 659 n.2 (7th Cir. 2010) (same); *Amrhein v. Health Care Serv. Corp.*, 546 F.3d 854, 859 (7th Cir. 2008) (same); *Domka*, 523 F.3d at 783 (same).

The second and third pieces of evidence are immaterial in any event. There is no evidence that

those who hired Milligan in Fall 2008 knew why he no longer worked in the chemical stockrooms; even if they had such knowledge, poor performance in the chemical stockrooms does not necessarily predict poor performance in the less dangerous positions Milligan assumed in the admissions and ticket offices. Thus, Milligan's hiring in Fall 2008 does not give rise to a reasonable inference that he was fired for reasons other than poor performance. The same holds for the fact that Milligan is the only employee that Kraft ever subjected to a performance review. For all the record shows, Kraft conducted a performance review because Milligan deserved it. There is no evidence that Kraft had other employees with comparable performance problems—weak attendance and accidents with dangerous materials—who were equally deserving of a performance review but did not receive one.

That leaves only timing. In egregious cases, suspicious timing alone might create a triable issue on causation. See *Loudermilk v. Best Pallet Co.*, 636 F.3d 312, 315 (7th Cir. 2011) ("Occasionally, . . . an adverse action comes so close on the heels of a protected act that an inference of causation is sensible."); *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 793 (7th Cir. 2007). But it rarely does. See *Coleman*, 667 F.3d at 860 ("We have often invoked the general rule that temporal proximity between an employee's protected activity and an adverse employment action is rarely sufficient to show that the former caused the latter.") (internal quotation marks omitted); *Moser v. Ind. Dep't of Corr.*, 406 F.3d 895, 905 (7th Cir. 2005) ("suspicious timing alone rarely is sufficient to

create a triable issue"); *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 981 (7th Cir. 2004) ("'mere temporal proximity' is not enough to establish a genuine issue of material fact"). Under ordinary circumstances, "[c]lose temporal proximity provides evidence of causation and may permit a plaintiff to survive summary judgment *provided that* there is other evidence that supports the inference of a causal link." *Scaife v. Cook Cnty.*, 446 F.3d 735, 742 (7th Cir. 2006) (internal quotation marks omitted, emphasis added).

This is not the rare case where temporal proximity alone creates a triable issue on causation. Milligan received notice in April 2008 that he would not retain his chemical stockroom position; that was approximately six months after his last sexual harassment complaint in October 2008, and over two months after his complaint in January 2008 that Meyers contacted him in violation of the letter of reprimand. We previously have held that a seven-week interval, standing alone, is insufficient to create a material issue regarding causation. See *Argyropoulos v. City of Alton*, 539 F.3d 724, 734 (7th Cir. 2008). The same result is warranted here, particularly given that SIU put forth strong and uncontradicted evidence that Kraft had good cause to decline to invite Milligan to return in Fall 2008—Milligan's waning interest in the chemical stockroom job and the accident with the liquid nitrogen canister.

### III. Conclusion

Meyers' treatment of Milligan—assuming it occurred as Milligan says—was despicable. If a comparable situation were to arise in the future, SIU would be well-advised to focus solely on whether the accusation is valid and not at all on the accused's stature on campus. But as shown above, SIU responded reasonably to Milligan's complaints about Meyers, and on this record a reasonable jury could not find SIU liable on his harassment claims. Nor could a reasonable jury find for Milligan on his retaliation claims.

AFFIRMED.

RIPPLE, *Circuit Judge*, dissenting.   This case presents many close questions of fact assessment and therefore presents a jury question. Accordingly, I would reverse the judgment of the district court and remand the case for further proceedings.[1]

---

[1] Since my colleagues in the majority have pretermitted any discussion of the other requirements of a sexual harassment claim, I shall not elaborate on the merits of these elements. Suffice it to say that, upon examination of the record and the

(continued...)

It is well-established that an employer is liable for a hostile work environment created by an employee when the employer does not respond promptly and adequately to employee harassment. *Sutherland v. Wal-Mart Stores, Inc.*, 632 F.3d 990, 994 (7th Cir. 2011); *Porter v. Erie Foods Int'l, Inc.*, 576 F.3d 629, 636 (7th Cir. 2009). Just as the severity and the pervasiveness of harassment must be assessed in light of all the circumstances, *see Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998); *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993), the assessment of whether a response to that harassment has been prompt and adequate must take into account all the facts and circumstances, *see Berry v. Delta Airlines, Inc.*, 260 F.3d 803, 811 (7th Cir. 2001) (noting that we must "'determine whether the employer's total response was reasonable under the circumstances as then existed'") (quoting *McKenzie v. Illinois Dep't of Transp.*, 92 F.3d 473, 480 (7th Cir. 1996)).

The majority opinion suggests that the response in the present case can be justified because it is "on par" with

---

[1] (...continued)

relevant case law, I am convinced, as my colleagues assume, that the other elements have been met. I note that the record in this case supports Mr. Milligan's theory that he was the object of the behavior in question because the perpetrator regarded him as not possessing the physical attributes usually attributed to someone of the male sex. *Price Waterhouse v. Hopkins*, 490 U.S. 228, 250-52 (1989) (plurality opinion) (woman harassed because she was perceived as being not sufficiently feminine), *superseded in part by statute*, Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1074.

responses determined to be prompt and adequate in other circumstances. Majority Op. at 10. But simply utilizing remedial tools found adequate in other circumstances hardly establishes that those tools were adequate for the present case. Nor does it establish that those tools were implemented with sufficient skill and sensitivity to constitute an adequate remedy in the situation at hand. Although "[w]e do not ignore hindsight, . . . the ultimate question is whether the [employer's] response was likely to succeed *ex ante*." *Sutherland*, 632 F.3d at 995; *see also Porter*, 576 F.3d at 637; *Berry*, 260 F.3d at 811. The basic purpose of the remedy is to permit an employee to get on with the business of making a living without the extraneous, and illegal, interference of the harassing activity. The absence of another attack by a predator is no "solution" if the employer's remedy nevertheless leaves the victim in substantial and reasonable fear of another imminent strike. *See Smith v. Sheahan*, 189 F.3d 529, 535 (7th Cir. 1999) ("Just as an employer may escape liability even if harassment recurs despite its best efforts, so it can also be liable if the harassment fortuitously stops, but a jury deems its response to have fallen below the level of due care."); *see also Berry*, 260 F.3d at 813 n.3 (same).

Actionable sexual harassment occurs when, under all the circumstances, the actions of the harasser are so severe or pervasive as to change the victim's terms and conditions of employment. *Oncale*, 523 U.S. at 81. In this case, among those facts and circumstances is the plaintiff's status as a student worker whose terms and conditions of employment most certainly included the need

for a work environment compatible with his status as a first-year, indeed, first-semester, college student in the academic department where he worked. An institution of higher learning assumes special responsibilities for all students, but especially undergraduate students, who undertake such a formative educational experience within its walls. A breach of that trust, even in a work environment, can have dire consequences to a neophyte in the halls of higher education. If sexual harassment occurs, and especially if the perpetrator is a faculty member, the University has a responsibility to implement a remedy that restores the victim's ability to work comfortably and effectively as a student worker.

On this record, a jury well *might* conclude that the implemented discipline of a letter of reprimand that forbade further contact between the alleged perpetrator and student workers was an ineffective response to the situation confronting the student-worker victim and, under the circumstances, presented little hope of restoring the victim to the terms and conditions of employment that he had a right to expect. In making this assessment, the jury would have the right to assess the alleged perpetrator's earlier history of untoward conduct, a history that had persisted despite an earlier letter of reprimand,[2] an earlier encounter with another student[3] and numerous other informal complaints by staff

---

[2]  R.40-5 at 11 (Koropchak Dep. 39-40).

[3]  *Id.* at 12 (Koropchak Dep. 42-45).

members.[4] The jury reasonably could conclude that the

---

[4]  R.40-4 at 16-17 (Kraft Dep. 61-64); R.40-7 at 7 (Kinsel Dep. 23). The majority claims that we ought not consider these incidents in determining whether SIU's response was adequate. It does so by quoting a statement in Mr. Milligan's brief that he was "the only person who complained of sexual harassment by Dr. Meyers." Appellant's Br. 12. That statement was made in the context of Mr. Milligan's effort to respond to the district court's view that Meyers was an "equal opportunity" harasser. There can be no question that Mr. Milligan raised adequately the argument that the University's response to Meyers's attacks was inadequate, and the record makes crystal clear that in the period between the first letter of reprimand in 1995 and the letter now in question, Meyers persisted in his untoward conduct toward University employees and students.

The record unequivocally demonstrates that the 1995 letter of reprimand did not quash Meyers's bad behavior. Koropchak's deposition says that, when the 2007 Milligan complaints came in, Koropchak received correspondence from the Dean of Science noting that the Dean himself had, at some unspecified time, "personally observed Dr. Meyers casually touching female members of [the Dean's] staff" and it made the staff "feel uncomfortable." R.40-5 at 11 (Koropchak Dep. 38). Koropchak described the correspondence as "*additional evidence that was suggestive of [an ongoing] pattern.*" *Id.* (Koropchak Dep. 39) (emphasis added). In their depositions, Kraft and Kinsel also mention incidents involving other staff members, none of which resulted in a formal complaint, without detailing when the behavior took place—although it was clearly before 2007 when Mr. Milligan complained. R.40-4 at 17 (Kraft Dep. 62); R.40-7 at 6-7 (Kinsel Dep. 18-23).

(continued...)

situation was not going to be cured by yet another letter of reprimand. The jury *might* conclude that the student worker, upon his arrival at the University, found himself in a situation in which an atmosphere of sexual harassment already was prevalent and with respect to which the University had adopted, negligently or consciously, a *de facto* policy of *laissez-faire*. Given these circumstances, the jury well *might* decide that the decision to issue yet another letter of reprimand constituted nothing more than an effort to maintain the status quo while placating the victim and his family. It might well determine that the University was obliged to act earlier and with more stringent measures.[5] After

---

[4] (...continued)

Drawing reasonable inferences in Mr. Milligan's favor, there is certainly evidence from which a jury could have concluded that Meyers's conduct was part of a pattern known to SIU officials and not sufficiently corrected by prior disciplinary attempts.

[5] The majority acknowledges that "the record supports the notion that Kinsel and Koropchak attempted to discourage Milligan from pursuing the matter because it would embarrass and harm an important member of the university community." Majority Op. at 11-12. Nevertheless, the majority is persuaded that SIU's response is adequate, as a matter of law, based on two other surrounding facts. First, two university employees, one in the Affirmative Action Office and one an ombudsman, encouraged the Milligans in the complaint process on one occasion and checked in with Koropchak after the investigation had started to determine its progress. *See id.* at 12. Second,

(continued...)

all, the remedy chosen by the University left the per-petrator on the scene, free to prowl the department in search of the individual who had caused the disciplinary action. Few first-semester college students tackle first-year chemistry courses in this ambiance.

The University's follow-up response of an order barring the alleged perpetrator from the campus might convince the jury that the University's response was indeed adequate. On the other hand, the jury might determine that this second course of action was too-little-too-late or that the enforcement of the bar was half-hearted or negligently lax. The evidence of record would support either view and therefore presents a jury question.

Finally, in determining the adequacy of the remedy, the jury was not obliged to ignore the plaintiff's account of the effect that the University's alleged failure to

---

[5] (...continued)

although they required repeated assurances that Mr. Milligan wished to proceed, Kinsel and Koropchak *subsequently* offered responses that "were *otherwise* reasonable and effective." *Id.* (emphasis added). The point remains that the most senior and important University officials with whom Mr. Milligan dealt throughout his ordeal discouraged his going forward with the complaint. While the ultimate question is whether the total response was reasonable under the circumstances, *see Berry v. Delta Airlines, Inc.*, 260 F.3d 803, 811 (7th Cir. 2001), the jury certainly had the right to assess whether the efforts of these University officials contributed to the inadequacy of the response.

respond adequately had on his future at the University. According to the plaintiff's testimony, which we must accept as true as long as the case is in summary judgment posture, the prospect of encountering the alleged perpetrator in the building was a prime cause in his shift of focus from a pre-medical concentration to another discipline. The jury might well determine that the student worker's account of the effect of this non-enforcement on his academic well-being was not as significant as he states and that intervening factors were the true cause in the alteration in his work and academic plans. On the other hand, the jury might determine that the plaintiff's second-semester decision-making was indeed caused by the alleged harassment and alleged lethargic implementation of a remedy. The jury might conclude that, given the plaintiff's age, education, experience and his student worker status, the response of the University was indeed negligent.

It is undisputed that the University acted; indeed, in *some* employment situations, its action may have been adequate. It is questionable, however, whether, in Mr. Milligan's particular situation, the University's action was a reasonable one. In assessing this question, the jury could consider the surrounding circumstances to determine whether the remedy was inadequate or whether its implementation was half-hearted. The cold record on summary judgment yields no definitive answer to this question, but a reasonable juror could construe the facts in such a way as to reach a conclusion supportive of the plaintiff's position.

The majority fears that this analysis "threaten[s] to carve a higher standard of protection for student workers than for other plaintiffs," a result that is unwarranted, among other reasons, because student workers are not so unusual in terms of the power imbalance that they face with their employers. Majority Op. at 18. I certainly agree that an imbalance of power is at the heart of "[m]any if not most harassment cases." *Id.* The situation of a student worker is unique not solely because of the student's characteristic vulnerability; it is unique because it is a part of a larger, special relationship between an institution of higher learning and an individual. In that relationship, the institution is entrusted with responsibilities for care of the student different from, and far in excess of, what an employer is expected to provide for an employee. *See supra* pp. 27-28. More importantly, however, my approach is hardly a new or radical statement of the standard to be applied and certainly recognizes no new category of protection for students or any other group in the abstract. Current law unequivocally instructs that we account for the particular circumstances of an individual employment relationship in assessing the reasonableness of an employer's response. It is a significant mischaracterization of my position to suggest that I propose some sort of heightened standard of protection for student workers. I simply suggest that Mr. Milligan's student-worker status must be included among the totality of the circumstances a jury would consider in the present case. The considerations I have outlined above simply highlight the particular facts of this case which *might* convince a jury, in

applying current law, to conclude that SIU failed to meet its obligations with respect to Mr. Milligan.

Because the record is not free of material factual issues regarding the adequacy of the University's response, I would reverse the judgment of the district court and remand the case for trial. Accordingly, I respectfully dissent.