In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 11-3000 & 11-3109

OTTO MAY, JR.,

*Plaintiff-Appellant/*
*Cross-Appellee*,

*v.*

CHRYSLER GROUP, LLC,

*Defendant-Appellee/*
*Cross Appellant.*

Appeals from the United States District Court
for the Northern District of Illinois, Western Division.
No. 02-C-50440—**Frederick J. Kapala**, *Judge.*

ARGUED APRIL 13, 2012—DECIDED AUGUST 23, 2012

Before BAUER, KANNE, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* More than fifty times between 2002 and 2005, Otto May, Jr., a pipefitter at Chrysler's Belvedere Assembly Plant, was the target of racist, xeno-phobic, homophobic, and anti-Semitic graffiti that ap-

peared in and around the plant's paint department. Examples, unfortunately, are necessary to show how disturbingly vile and aggressive the messages were: "Otto Cuban Jew fag die," "Otto Cuban good Jew is a dead Jew," "death to the Cuban Jew," "fuck Otto Cuban Jew fag," "get the Cuban Jew," and "fuck Otto Cuban Jew nigger lover." In addition to the graffiti, more than half-a-dozen times May found death-threat notes in his toolbox. Different medium, same themes: "Otto Cuban Jew muther fucker bastard get our message your family is not safe we will get you good Jew is a dead Jew say hi to your hore wife death to the jews heil hitler [swastika]." The harassment was not confined to prose. May had his bike and car tires punctured, sugar was poured in the gas tanks of two of his cars, and, most bizarrely, a dead bird wrapped in toilet paper to look like a Ku Klux Klansman (complete with pointy hat) was placed in a vise at one of May's work stations. May contacted the local police, the FBI, the Anti-Defamation League, and, of course, complained to Chrysler. And Chrysler responded: The head of human resources at the Belvedere plant met with two groups of skilled tradesmen (like May) and reminded them that harassment was unacceptable, a procedure was implemented to document the harassment, efforts were made to discover who was at the plant during the periods when the incidents likely occurred, and a handwriting analyst was retained and used. Unfortunately, the harasser or harassers were never caught.

   May sued Chrysler in 2002 (relatively early in the cycle of harassment) and alleged a variety of claims under

Title VII and 42 U.S.C. § 1981. Only his hostile work environment claim survived summary judgment and made it to trial. And at trial there were only four contested issues: First, whether someone other than May was responsible for the harassment. (Chrysler, obviously, would not be liable for self-inflicted "harassment.") Second, whether Chrysler took steps reasonably calculated to end the harassment. Third, to determine if punitive damages were appropriate, whether Chrysler recklessly disregarded May's federally-protected rights. And fourth, the amount of damages, if any.

The jury concluded that May carried his burden and awarded him $709,000 in compensatory damages and $3.5 million in punitive damages. Responding to Chrysler's post-verdict motions, the district court sided with May on the first two issues: May had presented sufficient evidence for the jury to conclude that Chrysler was liable for the hostile work environment. The district court believed, however, that the jury's compensatory damages award was excessive. Rather than returning to trial on compensatory damages, May accepted remittitur to $300,000. On the third issue, punitive damages, the district court sided with Chrysler, and concluded that May failed to present sufficient evidence for the jury to decide that Chrysler recklessly disregarded his federally-protected rights. The verdict on punitive damages was therefore vacated. Both parties appeal. Chrysler argues that it should not be held liable at all; May argues that the jury was entitled to conclude not only that Chrysler was liable but that it was reckless, and so the jury's verdict on punitive damages should be reinstated.

The district court correctly rejected Chrysler's motions for judgment as a matter of law on liability. It should have also rejected Chrysler's post-verdict motion for judgment as a matter of law on punitive damages. We reverse in part to reinstate the verdict.

## I. Background

To understand the particular nature of May's harassment, it is helpful to know a little about May's family story. We therefore begin, briefly, with May's grandfather, who moved to Cuba from Germany around 1911. Although he was Jewish, he married a Protestant woman from Cuba, and May's father was raised as a Protestant. Two years after Fidel Castro took power, when May was eleven, May and his family moved to Florida. When May was seventeen, he converted to Judaism so he could marry his girlfriend (she was Jewish). He has since divorced and remarried several times, but his connection to Judaism has endured, and he identifies as a Messianic Jew. Since 1988, May has worked at Chrysler's Belvedere Assembly Plant, in Belvedere, Illinois, as a pipefitter, repairing and maintaining equipment used to paint and assemble cars.

The events that produced this case started early in 2002 with vandalism to May's car and then to the loaner cars he used as replacements. The first car broke down on his drive home from work—sugar in the gas tank, according to the mechanic. He drove a second car for a few weeks before sugar was discovered in its tank too. That second car also had a tire disintegrate, as did the

tire of a third car he drove while the first two were in the shop. All this was reported to the local police and to Chrysler in February 2002. Three months later, May drove over a homemade spike hidden by rags and placed under his tire. He reported the incident to security and police the next day. May didn't notice a response from Chrysler, so he complained to a person in human resources at Chrysler's headquarters in Michigan. Approximately ten days later, Kim Kuborn, a human resources supervisor who eventually became the principal HR person on May's case, called May and told him he could park in the salaried lot, which is monitored by cameras. This solution didn't much please May, however, because a Chrysler security officer told him that some of the cameras did not record, that some did not work, and that the ones that did were not monitored.

The threatening messages started in the first half of 2002, with words "fuck" and "sucks" written on the tag of May's coveralls. In June 2002, a heart with "Chuck + Otto" was found on the wall of a materials elevator. (Chuck was one of May's closest friends at the plant.) May complained to management, but the writing was not removed until August 29. Two days later, May saw "Cuban fag Jew" on the wall of the same elevator. May reported the graffiti and it was cleaned four days later, on September 3. That same day, May found a printout of a chain email titled "Yes, I'm a Bad American" tucked into one of the drawers of his toolbox. The document had some hand-written additions. For example, next to a printed line that said "I think being a minority does not make you noble or victimized, and does not

entitle you to anything" was hand-written "Cuban sucks cock fag." Next to the printed line "I've never owned a slave, or was a slave, I didn't wander forty years in the desert after getting chased out of Egypt. I haven't burned any witches or been persecuted by the Turks and neither have you! So, shut-the-Hell-up already" was written "Cuban Jew [swastika] kill Jew Heil Hitler." May told his supervisor, labor relations, and security and provided Chrysler a copy of the note. May found another note in his toolbox on September 12. It said: "no one can help you fucken Cuban Jew We will get you Death to the Jews Cuban fag Die." Chrysler and the police were informed. Additional threatening graffiti targeting May was found on September 19 and 22.

On September 26, the head of human resources, Richard McPherson, and the head of labor relations, Bob Kertz, held two meetings (one with the first and third shifts, one with the second shift) with about sixty people from the skilled trades. McPherson addressed the groups about Chrysler's harassment policy. Some didn't appreciate the reminder; they were upset that skilled trades was being singled-out and complained that McPherson was telling them they could not have "fun" at work anymore. The meeting was just a meeting; McPherson did not meet with the attendees or interview them individually, even those who were upset by his lecture. May, for his part, was upset that McPherson gathered so few people. More than a thousand plant employees had access to the areas where the notes and graffiti were found. May told McPherson and others that he thought Chrysler needed

to do more. In particular, he thought installing sur-veillance cameras and swipe-key door locks (to monitor who was coming and going from particular areas) would be a good idea.

Just a few days after the meeting, on September 30, there was more graffiti: "Otto Cuban Jew die." At least five similar incidents with the same threatening theme—"a good Jew is a dead Jew"—occurred between September 30 and November 11. On December 7, May found another menacing note in his toolbox. This one told May that his "time is short" and proclaimed "death to the Jews" and "we hate the Jews" signing off with a "Heil Hitler" and swastika.

Soon after receiving the December 7 note, feeling that nothing was being done to stop the harassment, May contacted the Anti-Defamation League, a civil rights organization focused on combating anti-Semitism. In a letter dated December 26, 2002, a representative of the Anti-Defamation League wrote to Chrysler's general counsel in Michigan to inform Chrysler that "Mr. May has reportedly been the victim of numerous death threats placed in his toolbox, scrawled on his lunchbox and in the freight elevator as well as in other areas." The letter reminded Chrysler that the EEOC had issued a reasonable cause determination but that the threats continued, and encouraged Chrysler to take all neces-sary remedial action.

In January 2003, the letter from the Anti-Defama-tion League reached Scott Huller, a staff advisor in Chrys-ler's corporate diversity office. Huller's responsibilities

included investigating civil rights issues at Chrysler's manufacturing facilities. According to Huller's testimony, he had not heard of May until he received the letter from the Anti-Defamation League. The letter prompted Huller to travel to the plant to interview May, and they met for a few hours on January 16 and 17. May told him he genuinely feared for his life and was distressed and depressed. Once again, May recommended security cameras. According to May, Huller was focused on getting a list of suspects. He wanted names. The first day, May refused. At trial, May explained that his attorney told him not to "point the finger" at anybody without direct proof. The second day, however, after consulting with his attorney, May named nineteen employees he had some reason to suspect. May also gave the police a list of names.

It is not necessary to explain why May named each person that he did—the investigation is over—but we will say a few words about three people on May's list who were mentioned frequently at trial: Eldon Kline, John Myers, and Dave Kuborn. Eldon Kline was on the list because he was fired (briefly) for assaulting a Hispanic employee, he had made racist remarks to May, and May had filed a grievance against him. John Myers had also made racist comments to May and was close friends with Kline. May saw Myers' car (suspiciously, May testified) near his own shortly before he discovered it was vandalized, and so suspected his involvement. As for Dave Kuborn (married to Kim Kuborn in HR), there was no testimony that he had problems working with minorities, like Kline and

Myers; he made May's list because of their personal history. Dave Kuborn once instructed May to hold open a solenoid on a malfunctioning tire machine so the assembly line would not have to stop. This was dangerous, apparently, and May was upset that he was made to do it. He complained to Chrysler and reported the incident to the Occupational Safety and Health Administration (better known as OSHA) and, eventually, Dave Kuborn was disciplined.

So Huller got what he wanted from May—a list of names. Huller, however, did not interview anyone on the list or instruct the local HR employees to do so (and none did). Instead, Huller used the list to create a template for further investigation. The template was intended to help HR use plant entry and exit data ("gate ring records") to determine who was in the plant at the times when incidents might have occurred. Completing the spreadsheet was to be Kim Kuborn's job, not Huller's, who did no more substantive work on May's case.

Four days after Huller's meeting with May, more graffiti appeared. And later that same month (January 2003), May reported that someone was calling his work extension and making derogatory remarks in a disguised voice (essentially the same message as the notes and graffiti). May reported the calls but nobody from Chrysler discussed the details with him.

In March, there were two graffiti incidents and May found another death-threat note in one of his toolbox drawers. The note seemed to comment on the absence

of harassment in February: "Otto Cuban Jew muther fucker not forget about you your time is coming we will get YOU death to the Jews [swastika]." Chrysler's incident report documented that a police officer who came to the plant to collect the note said that a security camera should be installed to record future harassment.

The rest of 2003 followed a similar pattern.

- April: graffiti (2 incidents)

- May: graffiti (2 incidents)

- June: graffiti (3 incidents), a death-threat note, the tire of the bike May used to get around the plant was slashed, and the changing mat outside his locker was vandalized

- July: graffiti (6 incidents)

- August: graffiti (5 incidents)

- September: graffiti (5 incidents)

- October: graffiti (2 incidents, hateful as ever: "Hang the Cuban Jew")

- November: graffiti (2 incidents) and a death-threat note

- December graffiti (1 incident)

Sometime in 2003, Chrysler implemented a protocol for handling incidents involving May. According to McPherson (the head of HR at the plant), the person who found the graffiti or note was to notify HR and security, and a picture would be taken. After the incident was documented, someone from HR or security

would talk to whoever found the graffiti or the note to establish when it was found. If the incident involved graffiti, the area would be cleaned. Pictures of the incident and details about when and where it happened (including when the area was last seen without graffiti) were collected by Kim Kuborn, who kept a detailed but not quite complete record of May's harassment in a large binder. As already mentioned, Kuborn was also responsible for reviewing gate-ring records to determine who was recorded as being at the plant when she believed a particular incident may have occurred.

In May 2003, Chrysler's lawyers retained Jack Calvert, a forensic document examiner. Chrysler initially gave Calvert pictures (or copies of pictures) of graffiti. Soon Chrysler provided Calvert with an original note from June 2003, which Kim Kuborn collected quickly after its discovery, before the police arrived on the scene to take it themselves, and he went to the police to view more originals. Chrysler also gave him logbooks containing daily entries from many employees on different shifts. After reviewing this material, Calvert told Chrysler's counsel that he thought only one person was responsible for the graffiti and notes, but that he couldn't identify who. Based on what he had seen from the logbooks, he wanted additional "exemplars" (samples of handwriting) from approximately sixty employees. Chrysler responded with a variety of documents, including old job applications. (To jump ahead a bit, Calvert continued to collect exemplars throughout 2004 and into 2005. He ultimately issued his report in July 2007. It was inconclusive. More on this soon.)

The incidents continued through 2004 and ended in 2005:

- January, 2004: graffiti (5 incidents)

- February: death-threat note in May's toolbox

- March: graffiti (2 incidents)

- October: graffiti (2 incidents), May struck in the back with a flying object, submission of swastika in "Team Belvedere Logo Contest," and May found a dead bird dressed as Ku Klux Klansman in a vise

- February, 2005: May's car vandalized, graffiti (3 incidents), and a death-threat note ("Otto you muther fucker bastard your family is not safe Cuban Jew fuck scum Jew kike nigger lover kikes are varmints spics are roaches niggers are parasites Exterminate all kill them all We hate fucken Jews niggers spics [swastika]")

- June: graffiti and death-threat note on May's toolbox

- December: graffiti on May's toolbox

Chrysler's outward response to May's harassment involved McPherson's September 2002 group meetings, Huller's January 2003 interviews with May, ongoing documentation of the incidents, and (usually) prompt cleaning of graffiti. Behind the scenes, Kim Kuborn reviewed gate records to see who may have been around the plant when incidents occurred and Calvert was given more handwriting samples to analyze. Chrysler also wanted the jury to know that the employees at the Belvedere plant valued May as a colleague and cared about him as a person. For example, Kim Kuborn testified

that "this behavior was completely unacceptable in our eyes, and we wanted to stop it and find out who was responsible for it. We certainly didn't want this kind of activity going on in the plant and making one of our team members as uncomfortable as it clearly was."

Beyond cataloguing the actions it took in response to May's harassment, and somewhat at odds with the empathy expressed by some employees for May's predicament, Chrysler's defense had another (rather unsettling) theme: *May did it all to himself.* Chrysler kept this defense in the background and at times seemed to deny it was part of its defense at all. For example, when confronted about whether Chrysler really believed May was the culprit, Kim Kuborn said, "I have no evidence that he did this himself." Chrysler left it primarily to Jack Calvert, the forensic document examiner, and Rosalind Griffin, a psychiatrist hired by Chrysler to analyze May, to make the case *against* May, to argue that May was not being victimized by death threats and suffering because of Chrysler's inaction, but that, more likely, *Chrysler* was actually the victim of May's lies.

We have already summarized the mechanics of Jack Calvert's operation. He was given samples of graffiti and notes and known exemplars (handwriting samples from plant employees), and carefully compared the two. After his initial look at the materials, there were approximately sixty employees he could not rule out, and he requested more samples of their writing. He was given more samples and, during 2004 and 2005, whittled his list down to three. He was never able to reach a

conclusion about who did it, but he could only say that there was more evidence "that [this person] did author the material than that he did not" about one employee—Otto May, Jr. Calvert's testimony was challenged, of course. The jury heard that Calvert's list of possible authors was reduced not just by his own professional opinion but also by Chrysler informing him that twenty-six employees could be removed from consideration because they were not at the plant at the time of one of the incidents. The jury heard that those removed included Eldon Kline, John Myers, and Dave Kuborn. The jury also heard testimony that May was not eliminated as a possible perpetrator even though he, too, was not present when some of the incidents occurred. Chrysler never gave that information about May to Calvert. Chrysler did, however, give Calvert a large number of samples of May's writing, including May's notes documenting the harassment where, according to May's testimony, he tried to copy graffiti exactly as printed.

Griffin, the psychiatrist hired by Chrysler, also had a tough assessment of May's role in the harassment. According to Griffin, May has a number of personality disorders. She testified that he is histrionic, narcissistic, paranoid, and, less technically, deceptive. As she put it, he is the kind of person who will "scream louder and louder wolf, wolf, wolf, until they have your attention until you can see that they are very important" and who assumes "people are out to get you and that they're also doing things to persecute you and that they are planning your demise, and there's a conspiracy to bring about

your downfall." In Griffin's opinion, May did not suffer from depression and had no post-traumatic stress disorder. "[T]he injuries that he alleges was (sic) caused by his employer were his own demons within himself." May's psychotherapist, Dana Kiley, who May had been seeing for eight years, told a different story about May. In her opinion, May had been seriously depressed, and she did not think he had any of the personality disorders Griffin did—not histrionic, narcissistic, or paranoid. She did not think May was deceptive or that the harassment was a hoax.

After a seven-day trial, the jury also rejected Chrysler's implication. And beyond that, the jury decided that Chrysler's efforts to stop the harassment were inadequate, and substantially so, and accordingly returned a large verdict for May. As explained in our opening summary, the jury awarded May $709,000 in compensatory damages and $3.5 million in punitive damages. The compensatory damage award was remitted to $300,000 and the district court granted Chrysler's Rule 50(b) motion for judgment as a matter of law on punitive damages. Both parties appeal.

## II. Discussion

We review de novo a district court's grant or denial of a Rule 50(b) motion for judgment as a matter of law. *Ekstrand v. Sch. Dist. of Somerset*, 683 F.3d 826, 828 (7th Cir. 2012); *Kahn v. Bland*, 630 F.3d 519, 523 (7th Cir. 2010). Thus, like the district court, we decide whether the jury had "a legally sufficient evidentiary basis" for its verdict.

Fed. R. Civ. P. 50(a)(1); *Reeves v. Sanderson Plumbing Prods., Inc*, 530 U.S. 133, 149 (2000); *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 300-01 (7th Cir. 2009). To do so, we consider all the evidence in the record and "construe the facts strictly in favor of the party that prevailed at trial." *Schandelmeier-Bartels v. Chicago Park Dist.*, 634 F.3d 372, 376 (7th Cir. 2011). That includes drawing all reasonable inferences in that party's favor and disregarding all evidence favorable to the moving party that the jury is not required to believe. *Reeves*, 530 U.S. at 151; *Schandelmeier-Bartels*, 634 F.3d at 376. Although we must determine that more than "a mere scintilla of evidence" supports the verdict, *Hossack v. Floor Covering Assoc. of Joliet, Inc.*, 492 F.3d 853, 859 (7th Cir. 2007), we do not make credibility determinations or weigh the evidence, *Reeves*, 530 U.S. at 150. In other words, our job is to decide whether a highly charitable assessment of the evidence supports the jury's verdict or if, instead, the jury was irrational to reach its conclusion. *See, e.g., Von der Ruhr v. Immtech Int'l, Inc.*, 570 F.3d 858, 868 (7th Cir. 2009).

## A. Liability

To prevail on his hostile work environment claim, May had to prove that he was subject to unwelcome harassment based on his race, religion, or national origin, that it was sufficiently severe or pervasive to create a hostile or abusive work environment, and that there is a basis for employer liability. *See, e.g., Williams v. Waste Mgmt.*, 361 F.3d 1021, 1029 (7th Cir. 2004); *Mason v. S. Ill.*

*Univ.*, 233 F.3d 1036, 1043 (7th Cir. 2000). Of these, the only contested issue at trial and on appeal is employer liability. Chrysler would not be liable, of course, if May's harassment was self-inflicted. If May clears that basic hurdle, because his claim alleges harassment by coworkers, Chrysler could be liable for the hostile work environment if it did "not promptly and adequately respond to employee harassment." *Sutherland v. Wal-Mart Stores, Inc.*, 632 F.3d 990, 994 (7th Cir. 2011). That means, it needed to "respond in a manner reasonably likely to end the harassment." *Id.* at 995 (citing *Porter v. Erie Foods Int'l, Inc.*, 576 F.3d 629, 637 (7th Cir. 2009)). What is "reasonably likely to end the harassment," of course, depends on "the particular facts and circumstances of the case." *McKenzie v. Ill. Dep't of Transp.*, 92 F.3d 473, 480 (7th Cir. 1996). And those "facts and circumstances" include the "gravity of the harassment alleged." *Id.* It should go without saying that a reasonable response to taunting or insults may be an unreasonable response to death threats or physical violence. Finally, we recognize that success or failure stopping the harassment does not determine whether an employer is liable. Nevertheless, "the efficacy of an employer's remedial action is material to [a] determination whether the action was reasonably likely to prevent the harassment from recurring." *Cerros v. Steel Techs., Inc.*, 398 F.3d 944, 954 (7th Cir. 2005).

In this case, the jury was presented ample evidence to conclude that Chrysler did not "promptly and adequately" respond to the harassment. Consider only the death-threat notes and graffiti. By June 2002, there had

been two relatively minor incidents. The graffiti was not pleasant, but it had not yet turned threatening. Its tenor started to change at the end of August when "Cuban fag Jew" appeared. A few days later, May found the "Yes, I am a Bad American" note in his toolbox. That note, recall, included, among other things, the phrase "kill Jew." Approximately one week later, on September 12, May received a more alarming threat: "no one can help you fucken Cuban Jew We will get you Death to the Jews Cuban fag Die." A full two weeks later, Chrysler held two short meetings with about sixty employees total. Within days of those meetings, the graffiti and death threats resumed. There were more than half-a-dozen incidents between the McPherson meetings and the next notable action by Chrysler in January 2003, when Scott Huller, prompted by a letter from the Anti-Defamation League, traveled from Chrysler's corporate offices in Michigan to interview May. Huller came away from those meetings with May's list of suspects. Huller took that information and created a template for HR at the plant to use in its investigation. But nobody on May's list was interviewed. Within days of Huller's meetings with May, there was more graffiti. And soon after that graffiti, there were threatening calls to May on his work extension. There were seven more incidents—including another death-threat note in May's tool-box—before Chrysler took the next step in its investigation, retaining Jack Calvert, the handwriting analyst. That was May 2003. Every month for the rest of 2003 brought more graffiti, death-threat notes, or both.

For the purposes of Chrysler's liability, we can stop here. During the first year of written threats and harass-

ment, what had Chrysler done? They held a meeting. They interviewed May. And, one year in, they hired Calvert. Did that amount to a "prompt and adequate" response to multiple racist and anti-Semitic death threats? Especially in light of the gravity of the harassment, the jury was presented with more than enough evidence to conclude that Chrysler had not done enough. Chrysler, of course, characterizes its efforts differently. As it has it, the company was like a duck on a river, looking unpertured but paddling like crazy beneath the surface. Kim Kuborn, for instance, testified that she was all-but consumed by May's case and that she had never worked near as much on any other HR matter. Maybe that's true. But the jury certainly did not have to believe that her efforts at documentation with the gatering records were "adequate" or, even if it thought her efforts were adequate, that they started "promptly" enough for Chrysler to avoid liability.

In addition to hearing take-it-or-leave-it testimony about Chrysler's behind-the-scenes efforts, the jury heard about what Chrysler did not do. Two things stand out. First, the jury heard that Chrysler did not interview *anyone* on May's list. Not one person. When an employee has been subjected to repeated threats over the course of many months and the employer has a list of names, the employer's investigator should talk to some of those people—or at least a jury would not be irrational to think so. And perhaps that would be asking too much of Chrysler if it had explained to the jury that it had a different approach to the investigation that was also reasonably likely to be effective. *See Williams*, 361 F.3d

at 1030 (an employer's response need not be perfect or "textbook" to avoid liability for a hostile work environment). But the jury heard nothing of the sort. It heard that Chrysler documented the incidents and used gating records to narrow the field of potential suspects. In the face of repeated vicious death threats, a jury could conclude that Chrysler's document-and-narrow approach was not good enough.

Second, Chrysler did not install a single surveillance camera. May asked Chrysler to install cameras and the police made the same suggestion. Chrysler's response was consistent: The plant is *too massive*, four million square feet, the size of a terminal at O'Hare Airport. It is just not possible to cover it with cameras. What's more, the union would (probably) not allow it. Installing cameras with non-union labor would violate the contract with the union. And if cameras were somehow put up with union labor, if that could be negotiated, the perpetrator would know where the cameras were, and so would avoid them easily. But Chrysler's claims about what the union would allow and what was feasible were undermined by testimony that there was no hard rule that cameras could not be used, but only that the union would require notice, perhaps even something as simple as a sign: "surveillance cameras in use." And, more importantly, Chrysler's cameras-not-possible position was undermined by the fact that in 2008 it did put up a camera (neatly concealed in a fake emergency-lighting fixture) to catch someone destroying company property.

As in the 2008 case, May's situation did not require an encompassing surveillance system. A single camera covering May's large tool box (a tool chest, really)—where most of the threatening notes were found—would have been an important step. McPherson, the HR manager, testified that he considered cameras and that he even discussed the issue with the president of the union. According to McPherson, the union president said that if the camera caught someone doing something wrong, and if that employee were terminated, the union would grieve the termination. The parties dispute whether that means the union would grieve the termination of someone making racist death threats or if it would grieve the termination of *someone else* caught doing something improper, like sleeping on the job. Here we look at the evidence in the light most favorable to May. But regardless of how we interpret McPherson's comments about which dismissals the union would grieve, Chrysler still had an obligation to take steps reasonably calculated to end the harassment. It is not excused from taking those steps because it is concerned about friction with the union. Even if we assume (implausibly) that the dismissal of May's harasser would only have been temporary—that he would have to be rehired after the grievance process—or even if we assume that the camera would not have caught the harasser or would have been discovered and torn out, it would have been a step reasonably likely to end, reduce, or deter the harassment.

Although we mention Chrysler's decisions not to interview and not to put up a camera, we understand that

we do not "sit as a super-personnel department." *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 978 (7th Cir. 2004). We certainly do not, but in deciding this appeal we are required to assess the response of the actual personnel department. We did not conjure the ideas of interviewing the employees May considered suspects (or those Chrysler did) or of installing cameras; evidence about why Chrysler did not do those things was presented at trial. The jury had the right to consider that evidence—evidence of exactly what options Chrysler had and entertained—in deciding whether Chrysler took actions reasonably calculated to end the harassment. The evidence easily supports the jury's decision that Chrysler did not.

What about the idea that May himself was the culprit? Calvert, the most important witness on this point, did not conclude that May was the author but only that there was more evidence that May was the author than that he was not. And Griffin, the psychiatrist, testified that May was psychologically disposed, capable, or perhaps inclined, to commit such an astounding deception. That was evidence the jury could have run with but did not. That it did not is unsurprising in light of the testimony from Chrysler employees that they liked May, thought he was truthful, part of the team, and did not think he would have "harassed" himself. And there are also May's own denials. So, to be sure, Chrysler presented some evidence of May's guilt, but that evidence certainly did not (and does not) force any particular conclusion. At most, it raised a question. It was for the jury to answer, and it did, and we will not

(and on these facts cannot) second-guess that judgment here. *Ekstrand*, 683 F.3d at 828 ("The point is, we are generally forbidden from reexamining the facts found by the jury at trial.").

## B. Punitive Damages

May can recover punitive damages only if he presented sufficient evidence for the jury to conclude that Chrysler acted with "malice or with reckless indifference to [his] federally protected rights." 42 U.S.C. § 1981a(b)(1). To act with "malice" or "reckless indifference," "an employer must at least [act] in the face of a perceived risk that its actions will violate federal law." *Kolstad v. Am. Dental Assoc.*, 527 U.S. 526, 536 (1999). No evidence of "egregious" or "outrageous" conduct by the employer is required, although, of course, such a showing could support a conclusion that the employer acted with the requisite mental state. *Id.* at 535, 538.

We have already explained why it was appropriate for Chrysler to be held responsible for the hostile work environment: Its response was shockingly thin as measured against the gravity of May's harassment. And that would have been true if this kind of harassment would have lasted only for months or a year. The harassment in this case continued for over three years. There were over seventy incidents. As the harassment persisted over months and years, Chrysler had to "progressively stiffen" its efforts. *EEOC v. Xerxes Corp.*, 639 F.3d 658, 670 (4th Cir. 2011) (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 676 (10th Cir. 1998)). It was

unreasonable for Chrysler to "vainly hope[] that . . . the same response as before [would] be effective." *Id.*

If it was negligent to respond to weeks and months of death threats with a pair of meetings and documentation, what happens when that inadequate response does not improve over the course of a year? Two years? Three years? At some point the response sinks from negligent to reckless, at some point it is obvious that an increased effort is necessary, and if that does not happen, punitive damages become a possibility. The facts in this case do not force us to hazard a precise rule about when sticking with the same inadequate strategy becomes reckless. May's harassment continued for years, the threats were extremely serious, and there was scant evidence of an increased effort over time. In short, the jury had plenty to go on. Recall, Chrysler held a pair of meetings in September 2002, documented the events, did gate-ring analysis for many incidents, and used a handwriting analyst. Those measures were all in place approximately one year into the harassment. It continued for two more years.

Chrysler argues that they cannot be liable for punitive damages because they made a good-faith effort to comply with the requirements of Title VII. *Bruso v. United Airlines, Inc.*, 239 F.3d 848, 858 (7th Cir. 2001). A good-faith effort at compliance, however, is not a matter of *declarations* about how much the employer cared about a victim of harassment or about how hard certain HR employees say they worked to rectify the situation. When those declarations are belied by the employer's actions, talking a good game will not immunize an em-

ployer from a judgment that it was reckless. The jury reasonably determined that Chrysler's *actions* did not add up to a good faith effort to end May's harassment, and, much less, that its actions were (at least) reckless.

And even if we focus on Chrysler's declared feelings about May, the jury was presented evidence that Chrysler was not as concerned *for* May as it was about getting rid of him and keeping costs down. In April 2003, for example, Richard McPherson met with Kim Kuborn and Judith Caliman, one of Chrysler's lawyers, to discuss the harassment. One of McPherson's notes says: "Even if we win, we still have Otto May." When asked about this statement at trial, McPherson explained: "I'm saying even if we win, Otto May is still working for the company. So, do we really win. I mean, win, lose, or draw, my opinion, is there a winner, you know." McPherson then answered again differently and said that he was concerned that May would not feel good "if we win as a company and Mr. May walks away." We do not say, of course, what the jury had to believe about this testimony, but we can say that the jury did not have to believe Chrysler's own statements about how much it was concerned for May and how much it wanted to protect him from harassment.

Sticking to matters that are undisputed, we think it is also worth mentioning that Kim Kuborn, one of the HR employees principally responsible for May's case, never recused herself from the investigation despite the fact that her husband, Dave Kuborn, was on May's list of suspects. May had at least some reason to put him there: Dave Kuborn had May do something May considered

dangerous, May complained to OSHA, and Dave Kuborn was disciplined. But Kim Kuborn did not recuse herself because she "knew he wasn't the person involved" because he was not at the plant when some of the incidents occurred. (She "can't imagine a situation where there could be more than one person involved.") McPherson testified that his understanding was that "someone at corporate" was looking into Dave Kuborn. Even assuming that vague statement to be true, there is still no question that Kim Kuborn was at the center of Chrysler's investigation after she learned that May had named her husband as a suspect.

The bottom line in this case is simple, even if a little difficult to digest. May was subjected to repulsive harassment for more than three years. Chrysler suspected that May did it all himself. The jury, however, disagreed; Chrysler, it concluded, had not taken reasonable measures to stop the harassment. That was liability. (And, as explained, we have no doubt that the record easily supports the jury's decision on that issue.) With liability fixed, May's case for punitive damages is straightforward and persuasive: Chrysler did not increase its (meager) efforts over a long stretch of time in the face of remarkably awful harassment, and that was reckless. It would be nonsensical to eliminate the award of punitive damages based on sympathy for an argument that May's harms were self-inflicted if another issue, already resolved (liability), requires that they were not. On these unusual facts, there's no splitting the difference. The jury's verdict on liability is affirmed and the jury's verdict on punitive damages will be reinstated.

Before concluding, we have to address two more is-
sues. First, the district court conditionally granted Chrys-
ler's motion for a new trial on punitive damages. It did
so for the same reason it granted Chrysler's motion for
judgment as a matter of law, that is, because it believed
the evidence was insufficient. For the reasons already
stated, even under the high standard we use to evaluate
a district court's grant of a new trial, we believe that was
a mistake. *See Tart v. Ill. Power Co.,* 366 F.3d 461, 479
(7th Cir. 2004). There is ample evidence to support
the jury's verdict; the district court abused its discretion
by granting a new trial. *Id.*

Second, although the district court did not rule on
whether the jury's $3.5 million award of punitive
damages is "grossly excessive" and therefore violates
due process, *State Farm Mut. Auto. Ins. Co. v. Campbell*,
538 U.S. 408, 416 (2003); *BMW v. Gore*, 517 U.S. 559, 562
(1996), we asked the parties for supplemental briefing
so that we might consider that question now*, Smith v.
Kmart Corp.*, 177 F.3d 19, 33 (1st Cir. 1999); *Abernathy v.
Superior Hardwoods, Inc.*, 704 F.2d 963, 974 (7th Cir.
1983) (discussing this court's authority to order remittitur
(citing 11 Wright & Miller, Federal Practice & Procedure
§ 2820)). After reviewing the parties' submissions, we
are convinced that the punitive damage award does not
violate the Constitution and should therefore be
reinstated in full. The award is substantial—five times
the original compensatory damages and eleven times
the remitted amount—but Chrysler's long-term reckless-
ness in the face of repeated threats of violence against
May and his family is sufficiently reprehensible to

support it. *State Farm*, 538 U.S. at 419 (discussing "indifference to or a reckless disregard of health or safety" and "repeated actions" as opposed to "isolated incident" as significant factors in assessing the reprehensibility of defendant's conduct). We recognize that "few awards exceeding a single-digit ratio between punitive and compensatory damages, *to a significant degree*, will satisfy due process." *Id.* at 425 (emphasis added) (ratio of 145 to 1 grossly excessive). But "[i]n most cases, the ratio will be within a constitutionally acceptable range, and remittitur will not be justified on this basis." *BMW*, 517 U.S. at 583 ("breathtaking" 500 to 1 ratio grossly excessive); *see also Kapelanski v. Johnson*, 390 F.3d 525, 534 (7th Cir. 2004) (3.3 to 1 ratio "easily permissible"); *Mathias v. Accor Econ. Lodging, Inc.*, 347 F.3d 672, 678 (7th Cir. 2003) (37 to 1 ratio upheld). Of the three "guideposts" we are required to consider in deciding whether an award of punitive damages violates due process—reprehensibility of defendant's conduct, ratio of compensatory to punitive damages award, and disparity of the award with "civil penalties authorized or imposed in comparable cases," *State Farm*, 538 U.S. at 428 (quoting *BMW*, 517 U.S. at 575)—only the third factor supports a conclusion that the award is excessive. If this case were only under Title VII, and not also § 1981, May's damages would be capped at $300,000. That is a relevant consideration. But especially where the other two (and more important) guideposts cut the other way, "although the punitive damages awarded here are more than the damages available under Title VII for analogous conduct, the difference is not enough, by itself, to suggest that the punitive damages award violates due process." *Goldsmith v. Bagby Elevator Co.*,

513 F.3d 1261, 1284 (11th Cir. 2008) (quoting *Bogle v. McClure*, 332 F.3d 1347, 1362 (11th Cir. 2003)) (punitive damages for a hostile work environment under § 1981 five times the Title VII statutory cap not excessive).

### III.  Conclusion

We affirm the district court's judgment on liability. We reverse the district court's judgment on punitive damages and we also reverse the district court's conditional grant of a new trial. The case is remanded to reinstate the jury's verdict on punitive damages.

AFFIRMED IN PART, REVERSED IN PART,
AND REMANDED.

BAUER, *Circuit Judge*, concurring in part and dissenting in part.  I would affirm the district court's judgment on both liability and punitive damages for the reasons stated in the district court's excellent opinion. Other than that, I join in all portions of the majority opinion approving the rulings of the district court.